JOHN KELLY ET AL. *v.* CITY OF NEW HAVEN ET AL.

PETER BECKWITH *v.* MELVIN WEARING ET AL.

SHAWN BURNS *v.* CITY OF NEW HAVEN ET AL.
(SC 17331)

Sullivan, C. J., and Borden, Katz, Palmer and Zarella, Js.

Argued April 15—officially released September 27, 2005

*Thomas W. Ude, Jr.*, corporation counsel, with whom, on the brief, were *Kathleen M. Foster*, assistant corporation counsel, and *Jonathan H. Beamon*, assistant corporation counsel, for the appellants (defendants).

*Kenneth DeLorenzo*, for the appellees (plaintiffs).

*Opinion*

KATZ, J. The sole issue in this consolidated appeal[1] is whether the methodology for promoting police officers

---

[1] This appeal arises from partial judgments rendered in three separate, but similar, cases brought by various plaintiffs. Because the cases raise the same issues for review by this court and arise out of substantially similar facts, the defendants filed a consolidated appeal for administrative convenience. Due, however, to the differing procedural posture of the three cases, we treat them separately.

currently utilized by the defendants, the city of New Haven (city) and certain city officials; see footnote 1 of this opinion; whereby civil service examination scores are rounded to whole numbers and then treated as score groups, violates the New Haven charter (charter) provisions limiting the discretion that may be exercised in such promotions. The plaintiffs, certain city police officers who were passed over for promotion; see footnote 1 of this opinion; sought, in three separate actions, equitable and legal relief, alleging that this methodology violates the so called "rule of three" under the charter and the city's civil service rules and regulations (civil service rules) by allowing consideration of all the individuals in the three highest groups of scores created by rounding, rather than the three highest scoring individuals. The plaintiffs also alleged that the defendants' conduct violates the charter's provision prohibiting race-based discrimination in promotions,[2]

The first case; *Kelly* v. *New Haven,* Superior Court, judicial district of New Haven, Docket No. CV000444614S (March 4, 2005); was initiated in 2000 by John Kelly, James P. Kelly, Aaron Sweeney and Rebecca Sweeney-Burns against the city; Melvin Wearing, the city's chief of police; Tina Burgett, the city's director of personnel; and Richard Epstein, Jonathan Einhorn, Cathy Graves, Maria Fonseca, Jerome Streets and Steven Garcia, members of the city's board of police commissioners. The second case; *Beckwith* v. *Wearing,* Superior Court, judicial district of New Haven, Docket No. CV010454311S (March 4, 2005); was brought in 2001 by Peter Beckwith against the same defendants as in *Kelly.* The third case; *Burns* v. *New Haven,* Superior Court, judicial district of New Haven, Docket No. CV030477275S (March 4, 2005); was brought in 2003 by Shawn Burns and Beckwith against the city; Wearing; and six members of the city's board of police commissioners, Fonseca, Streets, Garcia, Christopher DePino, Babz Rawl-Ivy and Theodore Brooks. Burns subsequently withdrew from the third case and six other individuals who were listed on the promotion eligibility list at issue were added as interested parties. References in this opinion to the defendants are to the city and the named individuals sued in their official capacities.

[2] Article XXX, § 172, of the New Haven charter provides in relevant part: "No person . . . shall be appointed, promoted, reduced, removed, or in any way favored or discriminated against because of race, sex, age, national origin, or political or religious opinion or affiliation. No person shall willfully or corruptly make any false statement, certificate, mark, rating or report in

and the plaintiffs' federal constitutional right to due process and equal protection under 42 U.S.C. § 1983.[3]

Specifically, on October 27, 2000, the plaintiff John Kelly and three other police officers initiated an action against the city; its police chief, Melvin Wearing; the city's director of personnel, Tina Burgett; and certain members of the board of police commissioners challenging Eligible List 00-16 for promotion to the rank of lieutenant and Eligible List 98-65 for promotion to the rank of detective (*Kelly* case). On the plaintiffs' motion, the trial court, *Munro, J.*, issued a temporary injunction prohibiting the defendants from promoting certain candidates until further order of the court. On August 7, 2001, the plaintiff Peter Beckwith initiated an action against the same defendants named in the *Kelly* case challenging Eligible List 00-31 for promotion to the rank of sergeant (*Beckwith* case). On May 8, 2003, the plaintiffs Shawn Burns and Peter Beckwith, initiated an action against the city; Wearing, who had since retired; and certain city officials challenging Eligible List 03-02 for promotion to the rank of detective (*Burns* case).[4] On the plaintiffs' motion in the *Burns* case, the trial court also issued a temporary injunction prohibiting

regard to any test, certification, promotion, reduction, removal or appointment held or made under the provisions of this charter or in any manner commit or attempt to commit any fraud preventing the impartial execution thereof or of the rules and regulations made in accordance therewith. . . ."

[3] Section 1983 of title 42 of the United States Code provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

[4] In the 2003 *Burns* case, Beckwith also made allegations concerning the October, 2000 civil service examination for promotion to detective that was the subject of the case he initiated in August, 2001. See footnote 1 of this opinion.

the defendants from promoting certain candidates. Thereafter, the trial court scheduled a consolidated hearing in all three cases on the plaintiffs' claims for declaratory and permanent injunctive relief solely on the issue of whether the defendants' methodology violated the charter. Following a four day hearing, the trial court, *Pittman, J.*, declared the promotional practices to be in violation of the charter and permanently enjoined the defendants from rounding competitive examination scores so as to create tie scores and from assigning candidates to score groups based on rounded scores. The trial court then rendered partial judgment in the three cases in the plaintiffs' favor.

On appeal to this court, the defendants claim that the trial court improperly concluded that: (1) the charter limits the number of applicants who may be considered for any promotion; and (2) the practice of rounding civil service examination scores violates the charter. To the extent that the claims properly are before this court; see part I of this opinion; we disagree with the defendants and, accordingly, we affirm the partial judgment of the trial court.

The record reveals the following facts that are common to all three cases in this appeal. The plaintiffs are city police officers who sat for and passed civil service examinations for promotion to a higher rank. The charter requires such competitive examination of candidates to determine eligibility for promotion.[5] The city's civil service board[6] oversees and certifies the examination process. In practice, that board contracts with pri-

---

[5] Article XXX, § 167, of the New Haven charter provides in relevant part: "[A]ll appointments and promotions . . . shall be made according to merit and fitness to be ascertained as far as practicable by competitive examinations."

[6] Although it appears from the record that, at some point, the civil service board was known as the civil service commission, we refer to that body as the civil service board for purposes of clarity.

vate individuals and companies to devise and administer the examinations used to establish eligibility lists.

A total examination score of 70 percent or higher is required for an applicant to be placed upon an eligibility list. The examination consists of written and oral components. Each component is scored separately; however, those candidates who do not score 70 percent or higher on the written examination are not invited to participate in the oral examination. A computer program utilized by the testing company yields scores calculated to at least two decimal points. The scores are then weighted,[7] combined to create a total raw score, also calculated out to at least two decimal points, and provided to the city. The personnel director's office creates an eligibility list for each rank for which there is a vacancy, which in turn is approved by the civil service board.

Once an eligibility list has been certified by the civil service board, the list has no more than a two year life.[8] A candidate whose place in the ranking is not reached for promotion before the expiration of a list, or who has been passed over for promotion, can participate in the next examination when it is offered and attempt to make the new eligibility list.

When a vacancy occurs for a position, the chief of police chooses which candidate to promote among a prescribed number of candidates on the eligibility list

---

[7] The examination at issue in the *Burns* case weighted the oral and written components equally, whereas the examinations subject to the earlier actions may have afforded greater weight—60 percent—to the written examination score.

[8] Rule IV, § 2, of the New Haven civil service rules provides: "An eligible list shall be in effect from the date on which it is promulgated." Section 3 of rule IV of the New Haven civil service rules further provides: "Eligible lists shall be in effect for a period of at least one year but not more than two years from the date of promulgation."

and sends that recommendation to the board of police commissioners. The board of police commissioners is the appointing authority, but, as a practical matter, it routinely approves the recommendations of the police chief. Commonly, multiple appointments to a higher rank are made at one time.

The prescribed number of candidates who may be considered for promotion are set forth under the "rule of three" adopted by the city. First adopted in 1909, the rule of three was expressed as a requirement that promotion be made from "those applicants, not exceeding three, who shall stand highest" on the eligibility list. The city's civil service rules, promulgated by the civil service board under authority granted to it pursuant to the charter, similarly limit such promotion.[9] As early as 1972, however, the city adopted the practice of treating candidates with tie scores as being equally eligible for promotional consideration, thus creating a score group. In 1993, a revision to the charter changed the language setting forth the rule of three to provide that promotions from the eligibility lists must be from among "those applicants with the three highest scores."[10] The civil service rules continue to require

[9] Rule III, § 9, of the New Haven civil service rules provides: "The examination grades shall be based on a scale of one hundred points. No appointments or promotions within any class shall be made except from those applicants, not exceeding three, who shall stand highest on the list of those who shall have passed an examination of at least seventy percentum and have received a certificate to that effect from the Civil Service Board and are upon the list of those eligible to such position or promotion under the rules of said board, except supernumerary policemen and substitute firemen."

[10] Article XXX, § 160, of the New Haven charter provides in relevant part: "Whenever [the civil service] board shall have adopted rules relative to the appointment or promotion of any class of such officials, no appointments or promotions within such class shall be made except from those applicants with the three highest scores of those who shall have passed an examination with a score of at least seventy percentum and have received a certificate to that effect from said board, and are upon the list of those eligible to such position or promotion under the rules of said board, excepting supernumerary police and substitute fire personnel. . . ."

that promotions be made from "those applicants, not exceeding three, who shall stand highest" on the eligibility list.

In practice, before at least 1990, the defendants considered the individuals with the top three scores, calculated to at least two decimal points, for each open position. Because tie scores were relatively rare, the police chief and the board of police commissioners typically would be able to choose among three to four candidates for each open position.

Sometime between 1990 and 1994, the city changed the methodology it uses for promotions within the police department to the one at issue in the present appeal. Under the new methodology, the city personnel director rounds to the nearest whole number the computer generated scores given to the city by the outside testing company.[11] Under this methodology, raw scores with a decimal component below 0.50 are rounded down to the nearest whole number and those with a decimal component of 0.50 and higher are rounded up. Thus, computer generated scores of 89.51 and 90.49 both would become 90 percent. Scores below the seventieth percentile are not rounded up, however, to reach the passing grade.

After the personnel director rounds the scores, she creates an eligibility list by placing those candidates with tie scores into score groups. Thus, the defendants consider all of the candidates equally within the top three score groups created by rounding, rather than the top three individuals, for each promotion vacancy.

The following additional facts relate to the *Burns* case, the third action filed, but in substance are typical of all three cases. Between January and February, 2003,

---

[11] The scores on Eligible List 03-02, which is the subject of the *Burns* case, may have been rounded by the outside tester, rather than by city personnel.

Beckwith and Burns sat for and passed the examination for promotion to detective and were certified on Eligible List 03-02. Beckwith's raw score was 82.08, and Burns' raw score was 82.83. Before the scores were rounded, of the fifty-six people who passed the examination, Burns had the eleventh highest score, Beckwith had the fourteenth highest score, and the only pair of candidates with tie scores had the thirty-fourth highest score. After the city rounded the scores, there were fourteen groups of tie scores; Beckwith was in the seventh score group with four other candidates, and Burns was alone in the sixth score group.

In the first round of promotions from this list, the defendant members of the board of police commissioners, on the recommendation of Wearing, promoted thirteen candidates from Eligible List 03-02. All ten candidates from score groups one through five were promoted. Also promoted were one of the four candidates from group seven and two of the four candidates in group eight. Burns, in group six, and Beckwith, in group seven, were among the six passed over by the intended promotions. Thus, candidates whose raw scores would have ranked them at positions twelve, sixteen and nineteen were promoted over Burns at position eleven and Beckwith at position fourteen.

Thereafter, Beckwith and Burns brought their action alleging, inter alia, that the methodology applied to Eligible List 03-02 violated the charter, as well as the civil service rules. They alleged that the defendants were altering examination scores "for the purpose of creating large groups of identically ranked individuals in order to undermine and subvert the [r]ule of [t]hree as well as the mandate in the [c]harter that promotions be made according to merit, free of considerations of race and political favoritism." Essentially, they contended that the defendants were required to promote from among the top three scoring candidates, according to their raw

score, rather than from among three scoring groups artificially created so as to increase the defendants' discretion. They requested that the trial court enjoin the promotion of candidates listed below Beckwith's position of fourteen on the eligibility list until the promotion of at least one of the candidates whose unrounded score placed him or her above Beckwith in the eleventh or thirteenth position.

Following a hearing, on May 9, 2003, the trial court, *Munro, J.*, temporarily enjoined the promotion of the candidates who were listed sixteenth and nineteenth on Eligible List 03-02. Thereafter, the trial court scheduled a consolidated hearing on the plaintiffs' claims for declaratory and permanent injunctive relief in all three of the cases presently before this court.

On August 26, 2003, Burns withdrew as a plaintiff in the *Burns* case, leaving Beckwith as its sole plaintiff, and on September 18, 2003, Beckwith filed a second amended verified complaint. In the first count, brought against all of the defendants, he alleged that the methodology used by the defendants violates the rule of three under the charter, and he requested declaratory relief and a permanent injunction. In the remaining counts, Beckwith sought damages from the individual defendants for alleged violations of: (1) the charter provision prohibiting race-based discrimination; and (2) his federal constitutional right to due process and equal protection.

In September, 2003, the trial court, *Pittman, J.*, conducted a consolidated hearing on the three cases solely on the claims seeking a declaratory judgment that the defendants' methodology violates the charter and requesting a permanent injunction against the continued use of that methodology. During a four day hearing, the court heard testimony from each side as to the legitimacy of using rounded scores and the effect of

using score groups for examination purposes. The trial court refused to consider evidence, however, relating to whether the city, and Wearing in particular, had adopted the methodology to effectuate race discrimination, cronyism or nepotism in light of the limited scope of the issue before it.[12]

The trial court concluded that the defendants' methodology was unlawful. Specifically, the court found that "the practice of the [c]ity of (1) rounding off scores so that tie scores are then created, (2) grouping candidates with tie scores into one group as though they all had actually received the identical score on the exam, and (3) promoting from among any of those candidates whose scores fall into the top three score groups, violates the city charter and the civil service rules." In so holding, the trial court did "not credit the evidence of the [c]ity that, in the administration of competitive examinations for civil service purposes, rounding of multiple decimal point scores to the nearest whole number is justified as either an administrative convenience or as a valid way to eliminate insignificant discrepancies among exam candidates." Although the court declined to make any findings of fact regarding whether the city's motivation was cronyism, nepotism or racism, the court did find that the city's purpose for adopting rounding as a methodology was to create tie scores artificially

---

[12] The plaintiffs made an offer of proof that: (1) Wearing had engaged in a pattern of using his discretion, as it was increased by the defendants' methodology, to discriminate on the basis of race and to promote less qualified applicants over those with higher scores and better records of service; and (2) the former chairman of the board of police commissioners had made a statement to a news reporter that the city takes into consideration the racial makeup of the police department when making promotion decisions. The trial court refused to hear this testimony in full due to the limited nature of the hearing, which focused on whether the defendants' methodology violated the charter, not whether their motive for that methodology violated article XXX, § 172, of the New Haven charter or the federal constitution. The plaintiffs have requested a jury trial on the remaining issues in each of the three cases.

so as to increase its discretion in selecting candidates for promotion. In reaching its conclusion, the court adopted the analysis of two other trial courts that had found that the city's methodology violated its charter, one of which had resulted in a temporary injunction in the *Kelly* case. See *Kelly* v. *New Haven*, Superior Court, judicial district of New Haven, Docket No. CV 00 0444614 (June 11, 2002) (temporarily enjoining promotions based on city's methodology); *Bombalicki* v. *Pastore*, Superior Court, judicial district of New Haven, Docket No. CV378772 (February 28, 2001) (concluding that, although city's argument as to construction of charter "has some linguistic plausibility," its methodology nonetheless is improper because use of score groups may "lead to results that are absurd by any description"), aff'd on other grounds, 71 Conn. App. 835, 804 A.2d 856 (2002).

The trial court held that, in order to construe the charter in a manner that would not thwart its intended purpose or lead to absurd results, the pertinent language could not be parsed in such a way as to expand the discretion of the promoting authority so that he or she might chose "from among upward of forty or more candidates for each opening." The court rejected the defendants' argument that the 1993 revision to the charter, authorizing promotion of "those applicants with the three highest scores," allows for far greater discretion than the civil service rule authorizing promotion of "those applicants, not exceeding three, who shall stand highest . . . ." Thus, the trial court permanently enjoined the defendants from rounding or otherwise altering competitive examination scores so as to create tie scores and to increase discretion of the appointing authority, and from applying the rule of three to broad score groups created by rounding scores. The court then rendered a partial judgment in each of the three

cases, granting declaratory and injunctive relief. This appeal followed.[13]

I

The unique procedural posture in the three cases raises a threshold question as to whether the defendants are appealing from a final judgment. In each case, the trial court rendered a partial judgment addressing only some of the counts brought by the plaintiffs. Prior to oral argument, this court, sua sponte, ordered the parties to file supplemental briefs addressing this issue. We conclude that there is a final judgment in only one of the three cases, the *Burns* case.

We begin with our well settled principles relating to final judgments. "Because our jurisdiction over appeals, both criminal and civil, is prescribed by statute, we must always determine the threshold question of whether the appeal is taken from a final judgment before considering the merits of the claim." *State* v. *Curcio*, 191 Conn. 27, 30, 463 A.2d 566 (1983). "[W]e begin with the premise that, except insofar as the constitution bestows upon this court jurisdiction to hear certain cases . . . the subject matter jurisdiction of the Appellate Court and of this court is governed by statute. . . . It is equally axiomatic that, except insofar as the legislature has specifically provided for an interlocutory appeal or other form of interlocutory appellate review . . . appellate jurisdiction is limited to final judgments of the trial court. General Statutes § 52-263 . . . ."[14] (Cita-

---

[13] The defendants appealed to the Appellate Court from the partial judgments of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[14] General Statutes § 52-263 provides: "Upon the trial of all matters of fact in any cause or action in the Superior Court, whether to the court or jury, or before any judge thereof when the jurisdiction of any action or proceeding is vested in him, if either party is aggrieved by the decision of the court or judge upon any question or questions of law arising in the trial, including the denial of a motion to set aside a verdict, he may appeal to the court having jurisdiction from the final judgment of the court or of such judge, or from the decision of the court granting a motion to set aside a verdict,

tions omitted; internal quotation marks omitted.) *Doe v. Connecticut Bar Examining Committee*, 263 Conn. 39, 45, 818 A.2d 14 (2003).

"A judgment that disposes of only a part of a complaint is not a final judgment. . . . Our rules of practice, however, set forth certain circumstances under which a party may appeal from a judgment disposing of less than all of the counts of a complaint. Thus, a party may appeal if the partial judgment disposes of all causes of action against a particular party or parties; see Practice Book § 61-3;[15] or if the trial court makes a written determination regarding the significance of the issues resolved by the judgment and the chief justice or chief judge of the court having appellate jurisdiction concurs. See Practice Book § 61-4 (a)."[16] (Citation omitted; internal quotation marks omitted.) *Cheryl Terry Enterprises, Ltd.* v. *Hartford*, 262 Conn. 240, 246, 811 A.2d 1272 (2002). The latter basis for deeming a matter final has not been satisfied in the present case. We, therefore, limit our inquiry to whether the partial judgment in each of the cases disposes of all claims against one of the parties.

That determination in the present case requires an additional step in the analysis because the individual

except in small claims cases, which shall not be appealable, and appeals as provided in sections 8-8 and 8-9."

[15] Practice Book § 61-3 provides in relevant part: "A judgment disposing of only a part of a complaint, counterclaim, or cross complaint is a final judgment if that judgment disposes of all causes of action in that complaint, counterclaim, or cross complaint brought by or against a particular party or parties. . . ."

[16] Practice Book § 61-4 (a) provides in relevant part: "When the trial court renders a judgment to which this section applies, such judgment shall not ordinarily constitute an appealable final judgment. Such a judgment shall be considered an appealable final judgment only if the trial court makes a written determination that the issues resolved by the judgment are of such significance to the determination of the outcome of the case that the delay incident to the appeal would be justified, and the chief justice or chief judge of the court having appellate jurisdiction concurs. . . ."

defendants are city officials. We, therefore, must determine whether those defendants are being sued in their individual or official capacity. It is well settled law that an action against a government official in his or her official capacity is not an action against the official, but, instead, is one against the official's office and, thus, is treated as an action against the entity itself. See *Kentucky* v. *Graham*, 473 U.S. 159, 165–66, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' *Monell* v. *New York City Dept. of Social Services*, 436 U.S. 658 [690 n.55, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)]. . . . [In general] an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. . . . It is not a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." [Citation omitted.]); *Wade's Dairy, Inc.* v. *Fairfield*, 181 Conn. 556, 561, 436 A.2d 24 (1980) ("Since they represent not their own rights but the rights of the municipality the agents of the same municipal corporation are in privity with each other and with the municipality. When a judgment is rendered against an officer of a municipal corporation who sues or is sued in his official capacity, the judgment is binding upon the corporation, and upon other officers of the same municipal corporation who represent the same interest."). Therefore, if the individual defendants are being sued in a particular count only in their official capacity, a judgment as to that count disposes of that count as to the city. We note, however, that, in the present case, the three operative complaints do not specify in any of the counts whether the particular count

was being brought against the city officials in their individual or official capacities. Nonetheless, with the foregoing principles in mind, we turn to each of the cases.

A

We begin with the *Burns* case, the last filed, but the one that is most straightforward as to the final judgment issue. The trial court rendered partial judgment for Beckwith, the remaining plaintiff, on count one of his amended verified complaint. Count one was brought against the city and all of the individual defendants and requested declaratory and permanent injunctive relief. The remaining counts name only the individual defendants and seek damages. In their joint supplemental brief, the plaintiffs state that "the equitable claims against the [c]ity employees were against those employees in their *official capacity*, while all damages/monetary claims were against them in an *individual* capacity." (Emphasis added.) Because, under the posture of this case, that construction is reasonable, we conclude that the damages claims are not being asserted against the city. See *Miller* v. *Egan*, 265 Conn. 301, 307, 828 A.2d 549 (2003) (concluding that plaintiff's action not barred by sovereign immunity if complaint "reasonably may be construed to bring claims against the defendants in their individual capacities"). Accordingly, because the partial judgment in the *Burns* case resolves the only count brought against the city, it disposes of all causes of action against that party, and the requisite finality exists pursuant to Practice Book § 61-3.

B

We turn next to the *Beckwith* case. The following additional facts are relevant to the issue of finality. Beckwith originally commenced this action on August 7, 2001, in the Superior Court. See footnote 1 of this opinion. In eleven counts naming one or more of the

defendants, the verified complaint alleges that the defendants' actions with respect to Eligible List 00-31 violate the charter as well as Beckwith's federal constitutional right to due process and equal protection.

In October, 2001, the defendants removed the matter to federal court, and, in March, 2002, it was remanded back to the Superior Court due to a stipulation by Beckwith that all of his federal causes of action giving rise to federal jurisdiction were dismissed with prejudice. As a result of this stipulation, the following counts remained before the Superior Court: the first, third and fifth counts seeking only damages from certain individual defendants; the seventh count seeking declaratory and injunctive relief and damages from Burgett; and the eighth and ninth counts seeking declaratory and injunctive relief and damages from all of the individual members of the board of police commissioners.

The trial court issued a partial judgment in favor of Beckwith on counts seven and eight, but issued only declaratory and injunctive relief as to those counts— declaring that the charter had been violated and enjoining the continued practices of rounding the civil service examination scores and applying the rule of three to large score groups created by rounding. Thus, the trial court did not decide the claim for damages in the seventh and eighth counts, and it did not reach the first, third, fifth and ninth counts. On September 23, 2003, the day on which the consolidated hearing began, Beckwith filed a claim for a jury trial on the remaining counts.

Because, inter alia, the ninth count,[17] which was not resolved by the partial judgment, seeks injunctive relief,

---

[17] The ninth count alleges a violation of the charter provision prohibiting race discrimination. As we have noted previously, the trial court, *Pittman, J.*, expressly declined to make findings concerning the issue of discriminatory intent due to the limited nature of the September, 2003 hearing. See footnote 12 of this opinion.

a declaratory judgment and damages against the individual police commissioners, the judgment in this case is not final as to any defendant. The plaintiffs' supplemental brief asserts that the claims for injunctive relief are brought against the city officials in their official capacity. Therefore, we must construe this count as one against the city. See *Kentucky* v. *Graham*, supra, 473 U.S. 165–66. Accordingly, all counts against the city have not been resolved in the *Beckwith* case, and there is not a final judgment in the case.

## C

We now turn to the *Kelly* case. As we previously have noted; see footnote 1 of this opinion; the plaintiffs, John Kelly, James P. Kelly, Aaron Sweeney and Rebecca Sweeney-Burns, have brought this action against the city, Wearing, Burgett, and certain members of the board of police commissioners, alleging in forty-one counts that the methodology employed by the defendants with respect to the police department's eligibility lists violates the charter, as well as the plaintiffs' federal constitutional right to due process via 42 U.S.C. § 1983.

Following the consolidated September, 2003 hearing, the trial court, *Pittman, J.*, rendered a partial judgment in the matter in favor of the plaintiffs on counts one, four, six, eleven, fourteen, sixteen, nineteen and twenty-one. The trial court's partial judgment granted declaratory and injunctive relief only, however, as to those counts.[18]

On September 23, 2003, the day that the consolidated hearing began, the plaintiffs also filed a claim for a jury trial on the remaining counts. These remaining claims seeking damages include: (1) twenty counts brought against the city; (2) eight counts against Wearing for

---

[18] Therefore, although the trial court found for the plaintiffs on counts four, fourteen and nineteen, it did not hear testimony on, or grant relief as to, the monetary relief requested in those counts.

violating the charter provision prohibiting race-based discrimination and the plaintiffs' federal constitutional right to due process; (3) four counts against the individual members of the board of police commissioners for violating the plaintiffs' right to due process; and (4) one count against Burgett for violating the charter.[19]

After an examination of this procedural history, it is clear that none of the defendants subject to the partial judgment may claim that all causes of action against them have been disposed of in accordance with Practice Book § 61-3. The dispositive fact is that the partial judgment addressed only one of twenty claims brought against the city. Thus, even if we were to construe the claims remaining against the individual defendants as having been brought against them in their individual capacities, the claims remaining against the city preclude finality in this case.[20]

In their supplemental briefs, the plaintiffs and the defendants both contend that the partial judgment granting equitable relief is appealable because the city's rights are now fixed in relation to the permanent injunction. The plaintiffs cite *Glasson* v. *Portland*, 6 Conn. App. 229, 231 n.3, 504 A.2d 550 (1986), for the proposition that an appeal may be heard when an injunction has determined a party's rights, even though a hearing on damages had not yet been held. In that case, however, all issues raised in the complaint had been resolved by the court. Id., 231. Similarly, in other cases in which a party has been permitted to appeal an injunc-

[19] It is unclear from the record why the count against Burgett, which is substantially similar to the counts on which the trial court ruled, was not included in the partial judgment.

[20] Accordingly, we need not decide whether it is plausible to construe the eight counts remaining against Wearing (alleging violations of the charter provision barring discrimination and the right to due process) and the one count remaining against Burgett (alleging a violation of the charter) as having been brought against them in their individual capacities.

tion absent a determination of the damages, all issues alleged in the complaint as to liability had been determined, leaving only the issue of the amount of damages owed. See *Walton* v. *New Hartford*, 223 Conn. 155, 162 n.9, 612 A.2d 1153 (1992); *Ricci* v. *Naples*, 108 Conn. 19, 22, 142 A. 452 (1928). In contrast, liability is still being contested with respect to a majority of the counts in the revised complaint in the *Kelly* case. Thus, it cannot be said that finality exists in that case for purposes of subject matter jurisdiction. We, therefore, conclude that our subject matter jurisdiction is limited to the appeal from the partial judgment rendered in the *Burns* case.[21]

## II

We now turn to the merits of this appeal, namely, whether the methodology employed by the defendants, whereby they applied the rule of three to score groups created by rounding, was permissible under the charter. The defendants[22] challenge the trial court's partial judgment on two separate grounds. First, they contend that, in the absence of a charter provision or rule directing

[21] Because we conclude that there is finality in one of the cases, we are able to reach the merits of the defendants' claims regarding the legality of the methods employed by them in the formulation of the eligibility lists for the police department promotions. We note that, although our decision as to the merits of the defendants' methodology is technically limited to the *Burns* case, in which there is a final appealable judgment, the trial court in the *Kelly* and *Beckwith* cases necessarily will be bound by the charter interpretation expressed in this opinion. See, e.g., *Almada* v. *Wausau Business Ins. Co.*, 274 Conn. 449, 457, 876 A.2d 535 (2005) (concluding that trial court was bound by this court's interpretation of exclusivity provision of Workers' Compensation Act in *DeOliviera* v. *Liberty Mutual Ins. Co.*, 273 Conn. 487, 870 A.2d 1066 [2005]).

[22] Because we have concluded in part I of this opinion that finality exists only with respect to the partial judgment rendered in the *Burns* case, references to the defendants in part II of this opinion refer to the city and those city officials who have been sued in that case in their official capacity. Beckwith is the only remaining plaintiff in the *Burns* case and we refer to him by name.

how the city's civil service examinations are to be scored, the trial court improperly determined that rounding scores violates the charter, given the defendants' unrefuted evidence that it is reasonable and customary in employment testing to round off scores to account for the standard error of measurement in a test. Second, the defendants contend that the trial court improperly concluded that the defendants' use of score groups contravenes the charter provision limiting the number of applicants who can be considered for any position to three when the 1993 revision to the charter removed that limitation.[23]

Beckwith, the only plaintiff remaining in the *Burns* case; see footnote 22 of this opinion; responds in kind to the defendants' two part argument. First, Beckwith contends that rounding or altering competitive scores so as to create unnecessary tie scores and increased discretion for the appointing authority violates the charter because the defendants' practice thwarts the charter's purpose of limiting, as far as possible, favoritism and partisanship, and leads to absurd results. Second, Beckwith counters that score grouping violates the clear and unambiguous rule of three language in the charter and civil service rules, which limits the discretion of the promoting authority to choosing from among three applicants. We agree with Beckwith that the trial court properly concluded that the defendants' methodology violates the charter, although we reach that conclusion by different reasoning.

---

[23] The defendants also claim that the trial court improperly determined that General Statutes § 7-414 bears on the issue before us. We agree with the defendants that § 7-414 is inapposite here, in part because General Statutes § 7-407 expressly provides that the civil service requirements set forth in General Statutes §§ 7-408 through 7-424 may be adopted at the discretion of the municipality. See General Statutes § 7-407 (providing in relevant part that "[a]ny political subdivision of this state may adopt the provisions of this part [of chapter 113 of the General Statutes entitled 'Merit System' governing municipal employees] in the manner hereinafter provided").

As we begin our analysis, we underscore the lens through which we view the issue before us. The issue is whether the methodology employed by the defendants violates the charter. This methodology, however, consists of two *interrelated* practices: first, the defendants round examination scores to create broad score groups; then they apply the rule of three to those broad score groups. In contrast, the defendants seek to frame the issue as presenting two separate questions, claiming that: (1) the rounding of civil service examination scores is acceptable since the charter does not explicitly forbid the practice; and (2) the practice of score grouping is permissible under the charter. We decline to adopt the defendants' approach for two reasons. First, this approach would require us to speculate as to whether the charter allows the defendants, under *any* circumstances, to engage in one or the other of the two practices that comprise the methodology at issue here. We generally eschew, however, making legal pronouncements on matters not directly presented. Second, this approach does not comport with reality: the defendants do not *only* round the examination scores, nor do they *only* apply the rule of three to score groups. In other words, as Aristotle observed, the whole is more than the sum of its parts. Aristotle, Metaphysica, para. 1045. That observation is certainly apt here, and thus it is to the whole that we apply our analysis.

## A

We first outline the relevant evidence: (1) comparing how the defendants previously applied and currently apply the rule of three; and (2) explaining the rationale for using the current methodology. As noted previously, prior to 1990, police civil service examination scores were calculated out to at least two decimal points on a scale of 1 to 100. Both the charter and the civil service rules provided that promotion must be made from "those applicants, not exceeding three, who shall stand

highest" on the eligibility list. Around 1972, to address the problem of tie scores, the civil service board adopted the practice of treating candidates receiving tie scores as one "rank" or score group. Tie scores under the raw scoring method, however, were relatively rare.[24]

In 1991, the city began the process of revising its charter, with the resulting revisions effective July 1, 1993. The 1993 revision changed the language of the rule of three to provide that promotions from the eligibility lists must be from among "those applicants with the three highest scores . . . ."[25] New Haven Charter, art. XXX, § 160. By December, 1993, the city changed its scoring methodology, as applied to police department eligibility lists, and began rounding the scores to whole numbers. The frequency of tie scores and the number of candidates sharing the same score dramatically increased as a result of the change in methodology. For example, the 2000 eligibility list of 149 candidates eligible for promotion to sergeant reflects raw scores resulting in 139 individual scores and five pairs of candidates with tie scores, but rounded scores resulting in one individual score and twenty groups of tie scores ranging in size from two to twenty-two candidates.[26]

---

[24] The defendants contend that tie scores were not uncommon prior to their rounding of scores. In support of that contention, the defendants submitted a 1990 eligibility list for one position wherein thirty-four raw scores resulted in nine tie score groups, with the groups ranging in size from two to seven candidates. The parties submitted several other eligibility lists, however, in connection with the September, 2003 hearing that amply could have supported a conclusion by the trial court that the 1990 eligibility list was an anomaly: among the fifty-six raw scores of Eligible List 03-02, there were no ties; among the thirty-five raw scores of Eligible List 00-16, there were no ties; among the 149 raw scores of Eligible List 00-13, there were only five pairs of candidates with tie scores; and among the 106 raw scores of Eligible List 98-65, there were only six pairs of candidates with tie scores.

[25] See footnote 10 of this opinion for the revised text of article XXX, § 160, of the New Haven charter.

[26] Within the twenty score groups created by rounding there were two groups of two candidates, three groups of three candidates, one group of four candidates, three groups of five candidates, one group of six candidates,

Thus, depending on how the defendants exercised their discretion, the pool for promotional consideration could have been as large as forty-five candidates under the present methodology.

The defendants' change in application of the rule of three to the raw scores as compared to rounded scores is illustrated in the following simplified hypothetical:

| Candidate | Raw score | Score group before rounding | Rounded score | Score group after rounding |
|---|---|---|---|---|
| A | 89.49 | 1 | 89 | 1 |
| B | 89.42 | 2 | 89 | 1 |
| C | 89.42 | 2 | 89 | 1 |
| D | 88.51 | 3 | 89 | 1 |
| E | 88.49 | 4 | 88 | 2 |
| F | 87.62 | 5 | 88 | 2 |
| G | 87.51 | 6 | 88 | 2 |
| H | 85.41 | 7 | 85 | 3 |
| I | 85.41 | 7 | 85 | 3 |
| J | 84.61 | 8 | 85 | 3 |
| K | 82.77 | 9 | 83 | 4 |
| L | 82.61 | 10 | 83 | 4 |
| M | 82.52 | 11 | 83 | 4 |

Under the methodology previously employed by the city, applying the rule of three to the raw scores, A, B, C and D would have been eligible for promotion.[27] If C was chosen, A, B and D would be eligible for the next promotion. If D was chosen for the second promotion, consideration for the third promotion would be limited to A, B and E. Under the methodology presently at issue, candidates such as D and E, whose raw scores were only 0.02 apart, are in separate score groups. The defendants then would consider the ten candidates listed in the first three score groups for promotion and could choose to promote H, I and J with scores of 85 over seven candidates with scores of 89 or 88. If H, I

three groups of eight candidates, two groups of nine candidates, and one group each of ten, twelve, thirteen, fourteen and twenty-two candidates.

[27] As we noted previously, in reality, the board of police commissioners often makes multiple promotions at one time.

and J are promoted, thus eliminating score group three, the city could promote K, L or M in score group four, who have rounded scores of 83, while passing over seven candidates in score groups one and two with respective scores of 89 and 88.[28]

The parties presented the following testimony to the trial court on the merits of using rounding and the effect of employing score groups in testing. The defendants offered testimony by two city officials and an outside consultant to demonstrate that rounding is an accepted practice to account for standard measure of error in testing.[29] These witnesses indicated, however, that they

[28] Indeed, the trial court's memorandum of decision reflected that the defendants in fact engaged in such a practice, noting that the defendants "would sometimes chose to skip over all or nearly all candidates in an entire score group to reach those with lower scores for promotion." The court noted as an example that, under Eligible List 98-35, which was challenged in the *Kelly* case, everyone in score group ten was promoted, while eleven people who scored in the two higher score groups were passed over.

[29] Specifically, Noelia Marcano, previously a senior personnel analyst in the city's department of human resources and currently the chief examiner, testified that she was instructed by her supervisor, around the time she was hired in 1994, that rounding of scores was one way to deal with the standard measure of error in the examination process. She also testified that the standard measurement of error cannot be eliminated because tests in and of themselves are not a perfect measurement and that rounding, like using scaled scores or score ranges, is one of the methods utilized in her field to address the standard error. When asked on cross-examination if she was able to offer a reliable opinion regarding statistical margins of error in the testing procedure used by the city in the police department, she answered that she was not. Marcano indicated that she had not been involved in the decision to begin rounding scores, nor was she aware of a vote by the civil service board to commence the practice of rounding. Burgett, the city's personnel director since December, 1998, testified that she believed it was appropriate, based on her expertise, to round scores to whole numbers and that fractional scores do not represent a difference in substantive knowledge of the subject matter among the candidates. She was unable to say when, why or by whom the decision to round scores was made, and she confirmed that there is no record of either a decision by the previous director of personnel or a vote by the civil service board or by the board of aldermen to round scores. She did state that, upon assuming her responsibilities as personnel director in 1998, she made the decision to continue the practice because she believed it to be valid and saw no reason not to continue. Bruce Davey, the outside consultant who designed and implemented the

had no personal knowledge as to the basis for the city's decision to employ the practice of rounding, and the two city officials indicated that there was no record of a vote by the civil service board or board of aldermen to change to rounding scores. The plaintiffs offered testimony by Patrick Egan, the president of the firefighters' union, as to the city's methodology in applying the rule of three to fire department promotions. Although the same charter and rules apply to the police department and the fire department, Egan testified that the city also rounds fire department examination scores, but applies the rule of three differently.[30] Under the fire department's methodology, ties are broken by referring to seniority and, thus, if score groups exist, the city applies the rule of three to the three individuals with the highest ranking, according to seniority, within a score group. Moreover, in the fire department, unlike the police department, an entire score group is not passed over in order to promote a candidate in a lower score group.

On the basis of this evidence, the trial court, *Pittman, J.*, found that the defendants' purpose in adopting the practice of rounding was to create artificial tie scores to increase their discretion. In so finding, the court specifically noted that it did "not credit the evidence of the [c]ity that, in the administration of competitive examinations for civil service purposes, rounding of multiple decimal point scores to the nearest whole number is justified as either an administrative convenience

---

examination at issue in the *Burns* case, testified as an expert in the field of personnel testing and measurement. Davey testified that rounding is a practice that generally is accepted in his field, but that there is no uniform understanding among experts as to whether examination scores should be adjusted to account for the standard measurement of error. He reported that the city had begun the practice of rounding before he became involved with the examination process.

[30] Egan testified that the city did not implement the practice of rounding with respect to the fire department civil service examination until 1996.

or as a valid way to eliminate insignificant discrepancies among exam candidates."[31]

## B

Before turning to the merits of this appeal, we first set forth the standard of review that governs this issue. "[T]he scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Blumenthal* v. *Kimber Mfg., Inc.*, 265 Conn. 1, 7, 826 A.2d 1088 (2003).

"As with any issue of statutory construction, the interpretation of a charter or municipal ordinance presents a question of law, over which our review is plenary." *Broadnax* v. *New Haven*, 270 Conn. 133, 160, 851 A.2d 1113 (2004). We turn, therefore, to our usual tools of

---

[31] The defendants have challenged as clearly erroneous the trial court's conclusion regarding the lack of necessity for tie scores on the ground that their evidence as to the merits of rounding was unrefuted. "As we have stated, [i]t is the sole province of the trial court to weigh and interpret the evidence before it and to pass upon the credibility of witnesses. . . . [T]he trial court is not bound by the uncontradicted testimony of any witness." (Citations omitted; internal quotation marks omitted.) *Gianetti* v. *Norwalk Hospital*, 266 Conn. 544, 562, 833 A.2d 891 (2003). More significantly, we do not rest our conclusion on the trial court's findings as to whether the defendants' motives in adopting this methodology was proper. Rather, our focus is whether the results of the application of this methodology are consistent with the charter's rule of three and its directive that promotions are to be made, as far as practicable, by competitive examinations. The defendants' witnesses did not offer testimony as to whether its methodology was necessary to effectuate the purpose underlying the charter and its rule of three, nor did they offer justification for its application to a particular examination or type of merit assessment. We, therefore, need not consider the defendants' contention as to the trial court's finding.

statutory construction. In determining whether the city's methodology violates the statutory scheme of the charter, "we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . . In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter."[32] (Internal quotation marks omitted.) *Lombardo's Ravioli Kitchen, Inc.* v. *Ryan*, 268 Conn. 222, 230–31, 842 A.2d 1089 (2004).

In construing the civil service provisions of the charter, we are always mindful of "the importance of maintaining the integrity of [the city's civil service] system." *Broadnax* v. *New Haven*, supra, 270 Conn. 161. "Soon

---

[32] Moreover, with respect to the defendants' construction of the charter, we note "that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation." (Internal quotation marks omitted.) *DaimlerChrysler Services North America, LLC* v. *Commissioner of Revenue Services*, 274 Conn. 196, 202, 875 A.2d 28 (2005). "[W]here the judicial interpretation of a rule conflicts with the administrative interpretation, the judicial interpretation prevails." *New Haven Firebird Society* v. *Board of Fire Commissioners*, 32 Conn. App. 585, 590, 630 A.2d 131, cert. denied, 228 Conn. 902, 634 A.2d 295 (1993).

The defendants do not claim that their construction of the charter, as revised in 1993, is time-tested. To the extent, however, that the defendants assert that one of the two practices at issue here, score grouping, is time-tested, we note that, "[a]n agency's interpretation of a rule that clearly violates the rule's intent cannot become legal merely by the passage of time." Id., 591. Moreover, their interpretation has not withstood judicial scrutiny. The first judicial challenge to the city's methodology resulted in the trial court's finding that the city's construction of the charter could lead to results that would be "absurd by any description . . . ." See *Bombalicki* v. *Pastore*, supra, Docket No. CV378772 (concluding that methodology was improper but rendering judgment in defendants' favor on ground that plaintiff had been promoted to rank sought and thus court could not issue any meaningful relief).

after the formation of political parties in this country, the maxim '[t]o the victor belong the spoils' became current and its wide application gave birth to the so-called 'spoils system.' This in turn resulted in political scandals which have rocked the nation to its foundation. In an attempt to remedy this condition, various forms of merit systems have been adopted aimed to obtain qualified appointees and to ensure them a tenure of office free from interference on political or religious grounds." *State ex rel. McNamara* v. *Civil Service Commission*, 128 Conn. 585, 588, 24 A.2d 846 (1942).

It is these purposes that have undergirded the city's civil service legislation. "The [civil service] law provides for a complete system of procedure designed to secure appointment to public positions of those whose merit and fitness has been determined by examination, and to eliminate as far as practicable the element of partisanship and personal favoritism in making appointments. . . . A civil service statute is mandatory as to every requirement." (Internal quotation marks omitted.) *Broadnax* v. *New Haven*, supra, 270 Conn. 161.

C

In order to ensure that candidates are appointed on the basis of merit and fitness, without partisanship and personal favoritism, the charter and the civil service rules that have been promulgated under it set certain express requirements. The charter and the civil service rules require, inter alia: (1) a competitive examination that, in a fair, nondiscriminatory manner, measures skills needed for the position; (2) a grading scale of 100 points; and (3) a passing grade of at least 70 percent. See New Haven Charter, art. XXX, §§ 160, 167 and 172. Unquestionably, beyond these limitations, the charter vests broad authority in the personnel director to prepare, conduct and score examinations. Id., § 166 (j). This authority, however, does not include authorization

to act in a way that is unreasonable, arbitrary or illegal. See *Wallingford* v. *Dept. of Public Health*, 262 Conn. 758, 765 n.6, 817 A.2d 644 (2003) ("[a]lthough the court may not substitute its own conclusions for those of the administrative board, it retains the ultimate obligation to determine whether the administrative action was unreasonable, arbitrary, illegal or an abuse of discretion" [internal quotation marks omitted]); *Office of Consumer Counsel* v. *Dept. of Public Utility Control*, 246 Conn. 18, 43, 716 A.2d 78 (1998) (court will not uphold defendant department's practice if defendant has abused its discretion or exceeded its statutory authority).

One express limitation on the defendants' authority is the manner prescribed for the selection of candidates for promotion under the rule of three. Section 160 of article XXX of the New Haven charter provides that promotions are to be made "from those applicants with the three highest scores . . . ." It is unclear from this language whether the defendants may consider, as they contend, all those applicants with the three highest scores, irrespective of how those scores are derived and how many applicants share the three scores, as long as their scoring methodology is rational. As support for their contention, the defendants point to the 1993 revision to the charter, which they claim removed the limitation on their authority to chose among three applicants. Beckwith, by contrast, points to the civil service rule that remains in effect limiting the defendants' authority to choosing among three applicants as evidence that the 1993 amendment did not expand the defendants' discretion. We turn, therefore, to the genealogy and legislative history of the charter's rule of three.

In 1909, the city adopted the rule of three in its charter, requiring that promotions be made "from those applicants, not exceeding three, who shall stand highest

of those who shall have passed the examination." New Haven Charter, art. XXX, § 190 (1909). In 1972, the problem of how to resolve tie scores was brought before the civil service board. The minutes from an October, 1972 special meeting of the civil service board[33] indicate that the board voted "that in the future eligible lists upon which there are ties shall be resolved by giving to all of the tied candidates the same chronological number."[34] Thus, in accordance with the civil service board's vote, potentially more than three candidates could be considered for a vacancy if there were ties among the top three scores.[35] Neither the civil service

[33] We acknowledge that the minutes from such meetings are, by their nature, meant merely to summarize the content and not to provide exact quotations of the discussions that took place. To the extent, however, that they reflect general topics considered at these meetings, we find them to be a useful tool in analyzing the legislative history here.

[34] The minutes of the October, 1972 special meeting of the civil service board provide in relevant part: "The Secretary next stated that he had taken up the question of resolving ties with the Federal Civil Service Commission Office. He was advised that their system apparently is the one followed by the Civil Service Commission, and was also advised that it was believed that the New Haven Civil Service Commission had copied the Federal System i.e. that when an exact tie exists the candidates are listed alphabetically. The Secretary also reports that apparently the Federal System has a 'rule of three' with which it operates.

"A discussion of the inequities of the above solution was had, and then by motion, duly made and seconded, it was

"VOTED, that in the future eligible lists upon which there are ties shall be resolved by giving to all of the tied candidates the same chronological number.

"It was agreed that any eligible list upon which ties appear in the future, will carry an explanation at the end of said list, and that the tied candidates number will carry an asterisk after the same."

[35] This decision reflected a deliberate decision to depart from the federal model upon which the city's rule of three was based. See footnote 34 of this opinion. At that time, under the federal model, candidates with tie scores were listed alphabetically, and the rule of three strictly was applied to the eligibility list so that no more than three candidates could be considered for each promotion. Thus, under the federal model, if A received a score of ninety-eight, B received a score of ninety-seven, and C and D each received a score of ninety-six, only A, B and C would be considered for promotion. D could not be considered until one of the other three candidates had been selected for promotion.

rules, nor, more significantly, the charter, however, was amended in any way to reflect this change in practice.

In 1991, the charter revision commission held meetings to discuss potential changes to the civil service provisions of the charter. There was substantial discussion concerning the rule of three and the resolution of tie scores. The vice president of the police officers union advocated a strict application of the rule of three because of his organization's concern that subjectivity was seeping back into the city's evaluation process,[36] while others advanced proposals focusing on significantly expanding the city's discretion in selecting candidates. In particular, the city's affirmative action commission advocated deleting the rule of three altogether, leaving such matters to the discretion of the civil service board and allowing an affirmative action officer to seek out minority candidates without the constraints of the civil service system. Another proposal was to expand the board of police commissioners' discretion in selecting individuals for promotion by changing the rule of three to a rule of five. Despite these various proposals, the only change to the charter's rule regarding selection of candidates that was recom-

---

[36] Specifically, the July 17, 1991 minutes reflect that the vice president of the police officers union was "concerned with the practice of the [rule of three]. Their issue is with the tied scores on exams making the number of eligible candidates as high as [forty-five] or more." The defendants contend that these remarks indicate that the 1993 revision was intended "to conform to what appears to have been the practice even prior to the change in the text." In our view, it is unclear from this notation in the minutes whether the union official is indicating that, in 1991, tie scores as numerous as those in the large score groups created by rounding existed or whether he was raising a concern that one of the proposals before the charter revision commission could result in such broad discretion. There is no evidence in the record, however, that would support the conclusion that raw scores resulted in large groups of candidates with tie scores as with rounding. See footnote 24 of this opinion and the accompanying text. Moreover, there is no evidence that rounding was utilized prior to 1993. Indeed, the only eligibility list in the record from the period before the 1993 amendment to the charter's rule of three reflects raw scores.

mended by the charter revision commission and ultimately adopted by the board of aldermen[37] was to require selection from among the applicants with the three highest scores, rather than from "those applicants, not exceeding three, who shall stand highest" on the eligibility list, as originally set forth in the 1909 charter. The minutes of the meetings do not reflect the charter revision commission's intent in suggesting the change to the charter language. Moreover, despite the 1993 change to the charter, the civil service rule, promulgated in 1962, continues to require that promotion be made from "those applicants, not exceeding three, who shall stand highest on the list of those that shall have passed an examination." New Haven Civil Service Rules and Regs., rule III, § 9.

In light of this history, we can draw certain conclusions. Although it is clear that some change must have been intended in 1993 by amending the rule of three to the present language, the facts surrounding that change do not suggest that the charter revision commission intended to expand significantly the city's discretion by virtue of that change. First, the charter revision commission did not adopt as its final recommendation to the board of aldermen any of the specific proposals offered with respect to abandoning the rule of three limitation or expanding to a rule of five. Second, the charter revision commission crafted its language in light of then existing practices, whereby raw scores were used and tie scores were relatively rare. Thus, we cannot assume that the civil service commission intended to endorse the application of the rule of three to large score groups of applicants created by rounding examination scores.

---

[37] Although the charter revision commission may recommend changes to the charter, the board of alderman ultimately is charged with enacting, repealing and amending charter provisions. See General Statutes §§ 7-188 through 7-191; New Haven Charter, art. IX, §§ 37, 41 and 42; see also New Haven Charter, art. XXXIX, § 216 (mandating decennial charter review by charter revision commission).

Indeed, the most reasonable inference from this history is that the change to the rule of three was meant to codify the practice instituted by the civil service board in 1972 to resolve the rare tie scores under the previous methodology utilizing raw scores.[38]

That conclusion is underscored by the fact that a significant, substantive change in the charter's rule of three should have prompted action to amend the civil service rule to conform to the charter. Indeed, § 164 of article XXX of the charter as revised in 1993 confirms the rules of the civil service board in operation at the effective date of the charter and requires that the board restudy its rules to make necessary changes in accordance with the revised charter provisions. The fact that the civil service board did not amend its rule suggests that it found the civil service rule of three language basically compatible with the 1993 charter revision, thus further suggesting that the charter revision was not meant to implement far broader discretion than that exercised under the old rules.

We also are mindful of the policy that the charter was designed to implement, which similarly militates against a conclusion that the 1993 revision retaining the rule of three significantly expanded the defendants' discretion as applied under their methodology. The civil service board was designed "to eliminate *as far as practicable* the element of partisanship and personal favoritism in making appointments." (Emphasis added; internal quotation marks omitted.) *Resnick* v. *Civil Service Commission*, 156 Conn. 28, 33, 238 A.2d 391 (1968). Promotion on the basis of merit, not nepotism, has been

[38] In this regard, it is noteworthy that, according to the minutes of a July 17, 1991 charter revision commission meeting, Controller Ralph W. Halsey III addressed the topic of personnel and the civil service section of the charter and indicated that "[o]ne of the problems with [p]ersonnel and [c]ivil [s]ervice is the discrepancy between what is contained in the charter . . . and what is practice."

the guiding rule. *McAdams* v. *Barbieri*, 143 Conn. 405, 421, 123 A.2d 182 (1956). Thus, the defendants' discretion in making such promotional decisions must be limited. *Cassella* v. *Civil Service Commission*, 202 Conn. 28, 34–35, 519 A.2d 67 (1987). Prior to the 1993 amendment to the charter, this court explained the policy behind the rule of three, which "grants a department head the discretion to award a promotional position to any one of the three most qualified candidates. The underlying rationale for the granting of such discretionary power is that the department head should have a *limited* say in deciding whom he must work with on a daily basis. Certainly, however, no one would dispute that this discretionary power is not validly exercised in the name of merit selection if, in awarding a position, the department head is predisposed to excluding certain candidates from the position based upon factors unrelated to performance capability and compatibility." (Emphasis added.) *Hartford* v. *Board of Mediation & Arbitration*, 211 Conn. 7, 17, 557 A.2d 1236 (1989).

It is clear that the result of the defendants' methodology is a significant expansion of its discretion in choosing among the *most qualified candidates in a pool of* candidates who meet the threshold requirement for promotion. Turning again to the 2000 eligibility list for promotion to sergeant, using the raw scores, the defendants would have been able to choose from no more than four candidates, two of those having tie scores. As we have noted previously, that scenario is typical of the defendants' prior methodology using raw scores. See footnote 24 of this opinion. By contrast, using the rounded scores, the defendant potentially can choose from as many as *forty-five* candidates.[39] This distinction clearly demonstrates that the rounding of scores, when

---

[39] The forty-five candidates consist of ten with a score of seventy-eight, twenty-two with a score of seventy-seven and thirteen with a score of seventy-six.

applied to a process under which candidates with tie scores are treated as one score group warranting equal consideration under the rule of three, violates the spirit and the letter of the civil service provisions of the charter.[40] It is axiomatic that we "construe a statute in a manner that will not thwart its intended purpose or lead to absurd results. . . . We must avoid a construction that fails to attain a rational and sensible result that bears directly on the purpose the legislature sought to achieve. . . . If there are two possible interpretations of a statute, we will adopt the more reasonable construction over one that is unreasonable."[41] (Internal

[40] This is especially so in light of the allegations made by the plaintiffs in each of the three consolidated actions here, which, if true, soundly demonstrate that the purpose of the civil service legislation is subverted by the application of the methodology at issue. For example, the plaintiffs in the *Kelly* case allege that Sweeney-Burns was one of five candidates placed into a score group who was passed over for promotion in favor of seven candidates with lower examination scores and problematic service records but who were a different race favored by the appointing authority. They also allege that the only candidate of Sweeney-Burns' race who was promoted from a score group below her on the eligibility list was the son of the former police chief. Thus, the plaintiffs complain of exactly the abuse of discretion based upon nepotism and racism that the civil service system is meant to prevent.

[41] We note in this regard that the city's board of aldermen was approached with proposals to change the charter shortly after judgments had been rendered by our trial courts, holding that the defendants' current methodology violates the charter. Specifically, in June, 2002, the charter revision commission submitted a report to the board of aldermen as part of its mandated decennial review of the charter including a proposal to change the rule of three to allow promotion selections to be made from "the seven highest ranks, instead of the three highest scores." In an August, 2002 letter, Lindy Lee Gold, an alderwoman, asked, when submitting that report to the board of aldermen, that the board support the change to the civil service rule to remedy the constraints imposed under recent court interpretations concluding that the city was violating the charter: "[the] New Rule of Seven and new legislative history on file will give the City flexibility in hiring without compromising civil service and takes the hand-cuffs off the City that were imposed by recent judicial interpretation of the Rule of Three." Apparently, a ballot question was submitted to the voters asking whether to adopt the proposed revisions to the charter, including the change to the rule of three, but the voters rejected the revisions. To date, the board of aldermen has not changed the charter rule of three.

quotation marks omitted.) *Turner* v. *Turner*, 219 Conn. 703, 712–13, 595 A.2d 297 (1991).

In keeping with the policy objectives of civil service laws, we recently affirmed a civil service commission's discretion to set a three year time in grade requirement before a candidate could be eligible for promotion to a higher rank. *Mattera* v. *Civil Service Commission*, 273 Conn. 235, 869 A.2d 637 (2005). Notably, we did not conclude that the civil service commission in that case had unfettered discretion to set a limit, even though the city of Bridgeport's charter simply required candidates to hold a position "for one year or more"; id., 237; rather, we concluded, as did the trial court in that case, that the limit set was not an abuse of the discretion vested in the commission because it was a " 'rational standard' " and a " 'bona fide employment criterion . . . [that] provides both a stable work force and fiscal stability.' " Id., 239. In other words, we concluded that the civil service commission had exercised its authority in that case in a manner that furthered, rather than undermined, the purposes underlying the civil service system. Specifically, in *Mattera*, we fully adopted the opinion of the trial court, which reasoned: "[I]t cannot be overemphasized that proper competitive examinations are the cornerstone upon which an effective civil service system is built. Any violation of the law enacted for preserving this system, therefore, is fatal because it weakens the system of competitive selection which is the basis of civil service legislation. . . . Strict compliance is necessarily required to uphold the sanctity of the merit system. . . . [It is] [s]trict, not technical, compliance [that] is required. . . . Only rational results are allowed. . . .

"As has been the rule during the last sixty years of litigation, the [city] must strictly comply with its mandate to promote a fair and effective civil service system. The object of providing for civil service examinations

is to secure more efficient employees, promote better government, eliminate as far as practicable the element of partisanship and personal favoritism, protect the employees and the public from the spoils system and secure the appointment to public positions of those whose merit and fitness have been determined by proper examination. . . . Therefore any violation of an ordinance enacted for the purpose of preserving that efficiency is fatal because it weakens the system of competitive selection which is the basis of civil service legislation." (Citations omitted; internal quotation marks omitted.) *Mattera* v. *Civil Service Commission*, 49 Conn. Sup. 224, 231–33, 870 A.2d 483 (2004); see *Mattera* v. *Civil Service Commission*, supra, 273 Conn. 239.

Our holding in *Mattera* is only the most recent in a line of appellate cases which underscores that the authority of appointed boards must be exercised in conformity with the policy underlying a city's civil service legislation.[42] For example, in *Resnick* v. *Civil Ser-*

[42] In numerous cases, this court has underscored limitations on the authority to act under a civil service system, as informed by the underlying purpose of that system. See, e.g., *Broadnax* v. *New Haven*, supra, 270 Conn. 160 (city could not underfill higher position in order to fill lower positions when practice runs counter to civil service rules and makes little sense in system where board of aldermen is required to approve budget); *Civil Service Commission* v. *Pekrul*, 221 Conn. 12, 601 A.2d 538 (1992) (commission did not have authority to define assignment as "lateral move" rather than "promotion" in order to avoid choosing from highest candidates on eligibility list); *Cassella* v. *Civil Service Commission*, supra, 202 Conn. 34–35 (good faith does not justify departure from promotion made according to merit and fitness as ascertained by competitive examination); *New Haven Police Local 530* v. *Logue*, 188 Conn. 290, 297, 449 A.2d 990 (1982) (police department could not avoid civil service examinations by classifying reorganization as "duty assignments" rather than "appointments"); *State ex rel. Gaski* v. *Basile*, 174 Conn. 36, 38, 381 A.2d 547 (1977) (board could not ratify appointment based upon expired eligibility list); *Walker* v. *Jankura*, 162 Conn. 482, 294 A.2d 536 (1972) (personnel director did not have authority under civil service provisions to change timing of examination for purpose of increasing pool of candidates by two); *Ziomek* v. *Bartimole*, 156 Conn. 604, 610, 244 A.2d 380 (1968) (authority of board of police commissioners was exceeded through implementation of oral examination lacking uniformity and prear-

*vice Commission,* supra, 156 Conn. 32–33, this court concluded that a civil service board could not ask questions relating to an applicant's religion even if those questions were not part of the formal examination process because substantial compliance with provisions forbidding test questions regarding race and religion was not sufficient. Rather, strict compliance is required where the legislative intent is manifest in light of the purposes of the statute. Id. Similarly, in *New Haven Firebird Society* v. *Board of Fire Commissioners,* 32 Conn. App. 585, 591–92, 630 A.2d 131, cert. denied, 228 Conn. 902, 634 A.2d 295 (1993), the Appellate Court held that the city of New Haven did not have the authority to construe its civil service rules to allow it to designate candidates for promotion in advance of a vacancy, even though the defendant firefighters' union contended that the practice facilitated filling expected vacancies. Citing to the principles we later underscored in *Mattera* v. *Civil Service Commission,* supra, 273 Conn. 239, the Appellate Court concluded that such a construction of the rules was not reasonable, noting that its "conclusion is forged by the deeply rooted policies that support civil service examinations." *New Haven Firebird Society* v. *Board of Fire Commissioners,* supra, 592.

By contrast, in the present case, the trial court made a finding of fact that the city's change in methodology was implemented solely for the purpose of *increasing* its discretion. The evidence clearly bears out that, whatever the defendants' intent, the result is broad discretion to choose among a large pool of candidates for each vacancy. The rules, however, clearly are designed to allow the defendants *limited* discretion in the selection of candidates—in essence, allowing it to pass over a candidate who may lack the personal attributes necessary for the position despite obtaining a passing test

ranged scoring, and force of positive statutory provisions cannot be abrogated where statute does not specifically grant board that power).

score. When a methodology is implemented that allows for large groups of candidates to be passed over, as under the defendants' current methodology, the risk is greatly enhanced that such a methodology may become a subterfuge for discrimination and favoritism, in contravention of the purpose of the civil service rules.

Indeed, another jurisdiction recently has struck down as invalid a methodology designed to broaden greatly discretion in promotions. The Supreme Court of Washington rejected a civil service rule promulgated by the city of Seattle that permitted promotional consideration of "the top . . . [25] percent of the eligible register, or the top five . . . candidates, whichever number is larger . . . ." *Seattle Police Officers Guild* v. *Seattle*, 151 Wash. 2d 823, 827, 92 P.3d 243 (2004). The civil service rule at issue in that case was promulgated pursuant to a state statute establishing a prototype civil service system for cities. Id., 832. The prototype suggested a rule of one, but did not require strict adherence by individual cities; instead, the cities were given authority to develop a system that substantially accomplishes the purpose of the prototype statute. Id., 834. In affirming the lower court's decision striking the language allowing appointment from the top 25 percent of an eligibility list, the court concluded that this rule afforded too much discretion to the appointing authority and, therefore, failed to substantially accomplish the purpose of the civil service statute. Id., 830.

Although the defendants in the present case rely on certain cases from other jurisdictions as support for the position that they have not abused their discretion under the charter in applying this methodology, those cases do not support the broad discretion created here. As an initial matter, we note that none of these cases addresses the same methodology applied by the defendants. The cases address either one or the other of the two practices that comprise the methodology here

(rounding or applying the rule of three to broad score groups), but not both.[43] See *Ash* v. *Police Commissioner*, 11 Mass. App. 650, 652, 418 N.E.2d 622 (1981); *McGowan* v. *Burstein*, 71 N.Y.2d 729, 733, 525 N.E.2d 710, 530 N.Y.S.2d 64 (1988); *Akron* v. *Kettering* 106 Ohio App. 3d 547, 549, 666 N.E.2d 615 (1995).

For example, the defendants cite *McGowan* v. *Burstein*, supra, 71 N.Y.2d 733, for the proposition that New York's highest court has approved zone or band scoring. To the contrary, the court began its opinion by noting that "zone scoring poses a threat to the competitive examination process that serves as the foundation of the merit system. The use of overly broad zones could negate the competitiveness of the test, allow too much room for the subjective judgments of appointing authorities and invite personal and political influence into the selection process. Any practice with such potential must be approached with skepticism." Id., 732. Due to the nature of the constitutional challenge in the

[43] The defendants also cite *Guardians Assn. of New York City Police Dept., Inc.* v. *Civil Service Commission*, 630 F.2d 79, 100 (2d Cir. 1980), cert. denied, 452 U.S. 940, 101 S. Ct. 3083, 69 L. Ed. 2d 954 (1981), and *Application of Bettine*, 840 P.2d 994, 996–97 (Alaska 1992), for the proposition that rounding is an appropriate practice. Those cases are inapposite. The Second Circuit never expressly addressed the issue of rounding scores, and the issue before the court was whether the examination itself, not the scoring, constituted a legitimate attempt to choose candidates based upon merit in compliance with Equal Employment Opportunity Commission guidelines. *Guardians Assn. of New York City Police Dept., Inc.* v. *Civil Service Commission*, supra, 82. The Alaska Supreme Court's decision in *Application of Bettine*, supra, 994, addresses the propriety of grading essay answers to a bar examination on a scale of one to five using whole numbers. Neither the type of test nor the scoring of that test is at all similar to the present case, and the policies underlying the construction of civil service rules would have no bearing on bar examinations. It is interesting to note, however, that the defendant's expert in *Application of Bettine* testified that "most states" use the same methodology as the Alaska bar examiners. Id., 997. In contrast, Bruce Davey, the defendants' testing expert in the present case, testified that experts in his field have divergent opinions with respect to how one should adjust for standard error of measurement and whether rounding or banding is appropriate and, if so, to what extent.

case, however—the plaintiffs sought a blanket prohibition on the defendant's practice, as opposed to nullification based on a given set of facts or type of application—the court determined that the plaintiffs could not prevail because they had failed to show that "in *any* degree and in *every* conceivable application [zone or band scoring] would be unconstitutional." (Emphasis added.) Id., 733; see id., 732 (stating that "broadside nature of [the] plaintiffs' challenge bears emphasis").[44]

In *Ash* v. *Police Commissioner*, supra, 11 Mass. App. 652, the Massachusetts Court of Appeals held that a personnel administrator had not exceeded her authority when deciding to round test scores to whole numbers. We do not decide in the present case, however, whether the rounding of scores in isolation is an abuse of discretion. Therefore, the *Ash* decision must be read in light of the factual context in which rounding applied under that civil service system. Under that system, strict rank order was used and, when a promotion decision departed from that strict rank, such that the top scoring applicant was not selected, the decision maker was required by law to submit an explanation for its departure. See *Cotter* v. *Boston*, 193 F. Sup. 2d 323, 357 (D. Mass. 2002), aff'd in part, rev'd in part, 323 F.3d 160 (1st Cir.), cert. denied, 540 U.S. 825, 124 S. Ct. 179, 157 L. Ed. 2d 47 (2003). Thus, despite the rounding of scores, the discretion in selecting candidates under that system was quite circumscribed.

Finally, the decision in *Akron* v. *Kettering*, supra, 106 Ohio App. 3d 547, which the defendants cite in support

---

[44] Notably, in the New York case, the defendant rarely used the band scoring approach and when it did so, its purpose was primarily to focus on specific job considerations. *McGowan* v. *Burstein*, supra, 71 N.Y.2d 733–34. This approach is in stark contrast to the situation presently before this court where the defendants apply their methodology routinely, do not seek to limit its effect, and do not provide a justification for its application to any particular examination or type of merit assessment.

of the second practice employed in their methodology—applying the rule of three to score groups—also underscores a methodology in which promotional discretion is far more limited than that at issue in the present case. In *Kettering*, the Ohio Court of Appeals held that a candidate with a high score of 83.4512, two candidates tied for second with a score of 79.9674, and a candidate with the third highest score of 78.2256, could all be considered for promotion under a statute that provided for certification of "the persons with the three highest scores." Id., 548–50. The court concluded that this interpretation "does not controvert the purpose of the [city of Akron's] [c]harter." Id. In that case, the application of the rule of three to groups scored to the *fourth* decimal point, which still resulted in quite limited discretion, only serves to highlight how great are the liberties sought by the defendants in the present case.

In sum, rather than supporting the defendants' methodology, the foregoing survey of the case law to which they have pointed us serves to demonstrate the consistency of the limited discretion afforded in promotional decisions under the civil service system. To the extent that these cases recognize that, under certain circumstances, the practice of *either* rounding scores *or* creating score groups may be a reasonable exercise of discretion, we need not reach that question. Indeed, we underscore that, although we affirm the judgment of the trial court, we limit our conclusion to the facts at bar. Our holding applies to the defendants' methodology as a whole, which circumvents the letter and undermines the spirit of the charter's civil service provisions by allowing consideration of large groups of candidates for a single vacancy. This court will not endorse an effort to interpret out of existence the legislative check on discretion that the legislators have chosen to keep in place.[45]

---

[45] "While courts should draw on the findings of experts in the field of testing, they should not hesitate to subject these findings to both the scrutiny

The appeals with respect to the partial judgments in the *Kelly* and *Beckwith* cases are dismissed; the partial judgment in the *Burns* case is affirmed and that case is remanded for further proceedings according to law.

In this opinion the other justices concurred.

of reason and the guidance of [legislative] intent." *Guardians Assn. of New York City Police Dept., Inc.* v. *Civil Service Commission,* 630 F.2d 79, 89 (2d Cir. 1980), cert. denied, 452 U.S. 940, 101 S. Ct. 3083, 69 L. Ed. 2d 954 (1981).