******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

LEXINGTON INSURANCE COMPANY *v.* LEXINGTON
HEALTHCARE GROUP, INC., ET AL.
(SC 18681)
(SC 18682)

Rogers, C. J., and Norcott, Palmer, Zarella, Eveleigh, McDonald and
Espinosa, Js.*

*Argued November 30, 2012—officially released January 28, 2014*

*Jeffrey R. Babbin*, with whom were *Amber J. Hines* and, on the brief, *Michael Menapace*, for the appellant-appellee in Docket No. SC 18681 and cross appellant in Docket No. SC 18682 (plaintiff).

*Sean K. McElligott*, with whom were *Van A. Starkweather* and *Brian J. Ladouceur, Jr.*, for the appellees-appellants in Docket No. SC 18681 (defendant Marion J. Boynton, coadministratrix of the estate of Elizabeth M. Arata, et al.).

*Philip J. O'Connor*, for the appellee-appellant in Docket No. SC 18681 and cross appellee in Docket No. SC 18682 (defendant Nationwide Health Properties, Inc.).

*Opinion*

ROGERS, C. J. This case requires us to interpret various provisions of a professional liability insurance policy to determine the amount of coverage available when the same general event has given rise to a large number of claimants against the policy. On February 26, 2003, multiple residents of Greenwood Health Center (Greenwood), a Hartford nursing home, tragically died or were injured when the facility was set ablaze by another resident and rescue efforts by staff members fell short. As a result, thirteen negligence actions seeking damages for wrongful death or serious bodily injury were filed by some of the victims' personal representatives against Greenwood, Nationwide Health Properties, Inc. (Nationwide),[1] the owner and lessor of the property housing Greenwood, Lexington Healthcare Group, Inc. (Lexington Healthcare), the lessee of that property, and Lexington Highgreen Holding, Inc. (Highgreen), the operator of Greenwood. This case concerns the amount of liability insurance coverage available for these claims. The plaintiff, Lexington Insurance Company,[2] brought this declaratory judgment action against Lexington Healthcare, which is the insured party under a general and professional liability insurance policy issued by the plaintiff, as well as Highgreen, Nationwide and the victims' personal representatives[3] (individual defendants).[4] Nationwide and most of the individual defendants each filed counterclaims in regard to the policy, also seeking declaratory judgments. Following the parties' filing of cross motions for summary judgment, the trial court determined the amount of coverage available under the policy and rendered judgment accordingly.

The plaintiff appeals from the judgment of the trial court determining the available coverage. The plaintiff claims that the trial court misconstrued the policy language pertaining to "related medical incidents" and the endorsement relating to the "[a]ggregate [p]olicy [l]imit," thereby providing more coverage for the individual defendants' claims than that to which they were entitled. Four of the individual defendants have cross appealed,[5] claiming that the trial court's interpretation of the policy's self-insured retention endorsement resulted in an improper reduction of the available coverage. We disagree with the plaintiff's claim that the trial court misconstrued the policy language concerning related medical incidents, but agree with its claim that the court improperly interpreted the endorsement relating to the aggregate policy limit. We further agree with the individual defendants that the court improperly applied the self-insured retention endorsement to reduce the available coverage. Accordingly, we affirm in part and reverse in part the judgment of the trial court.[6]

The following facts and procedural history are relevant to these appeals. The individual defendants, in the

underlying actions, each alleged multiple and varying specifications of negligence against Lexington Healthcare and Highgreen. Some of the individual defendants' claims related to Lexington Healthcare's and Highgreen's choice to admit into Greenwood the individual who had started the fire and, thereafter, their failure to place, supervise and treat her properly and to disallow her from possessing cigarette lighters or smoking cigarettes independently. Other of the individual defendants' claims concerned general safety and emergency failures including, but not limited to: insufficient staffing; inadequate sprinklers, fire extinguishers and smoke detectors; lack of training in fire response and evacuation procedures; neglect to adhere to relevant rules, codes and standards; and a dangerously constructed, equipped and furnished facility. Specific allegations of negligence on the night of the fire also were raised, such as staff members' failures to respond properly to the fire by employing fire extinguishers and by closing particular doors and windows.

The policy issued by the plaintiff to Lexington Healthcare provided both general liability and professional liability coverage for Lexington Healthcare's seven nursing home facilities, one of which was Greenwood. It is undisputed on appeal that only the professional liability coverage is applicable to the individual defendants' negligence claims. As to the amount of coverage available for those claims, the trial court found that: (1) for purposes of applying the policy's $500,000 per medical incident limit for professional liability coverage, the acts, errors or omissions underlying each individual defendant's injuries or death constituted separate medical incidents and did not collectively comprise related medical incidents, in which case a single $500,000 limit would have applied; (2) the total amount of professional liability coverage available under the policy for all of the individual defendants' claims was the $10 million "[a]ggregate [p]olicy [l]imit" provided via an endorsement to the policy, rather than the $1 million "[a]ggregate [l]imit" for professional liability coverage stated in the policy declarations; and (3) a $250,000 "[s]elf [i]nsured [r]etention per [o]ccurrence" described in another endorsement to the policy applied to reduce the $500,000 per medical incident coverage to $250,000 per medical incident. This appeal and cross appeal followed. The plaintiff argues on appeal that the trial court's first two policy interpretations were improper, while the individual defendants take issue with the court's third interpretation.

"As a preliminary matter, we set forth the applicable standard of review. Summary judgment shall be rendered forthwith if the pleadings, affidavits and other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . The scope of our appellate review depends upon the proper characteriza-

tion of the rulings made by the trial court. . . . When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Ugrin* v. *Cheshire*, 307 Conn. 364, 389, 54 A.3d 532 (2012).

The general principles that guide our review of insurance contract interpretations are well settled. "[C]onstruction of a contract of insurance presents a question of law for the court which this court reviews de novo. . . . An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract . . . . In accordance with those principles, [t]he determinative question is the intent of the parties, that is, what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. . . . Under those circumstances, the policy is to be given effect according to its terms. . . . When interpreting [an insurance policy], we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result. . . .

"In determining whether the terms of an insurance policy are clear and unambiguous, [a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. . . . Under those circumstances, any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy." (Internal quotation marks omitted.) *Johnson* v. *Connecticut Ins. Guaranty Assn.*, 302 Conn. 639, 643, 31 A.3d 1004 (2011).

We now turn to the claims raised on appeal. Additional facts and procedural history will be provided where pertinent to those claims.

I

The plaintiff claims first that the trial court improperly interpreted the phrase "related medical incidents" as used in the policy, thereby affording greater coverage for the individual defendants' claims than the parties to the policy had intended. According to the plaintiff, the individual defendants' claims arose from "related medical incidents," because all of their injuries or

deaths stemmed from the same root cause, namely, the admission of the individual who started the fire to Greenwood and the failure to supervise her properly. The plaintiff argues, therefore, that a single policy limit applies to all of the individual defendants' claims collectively rather than to each claim individually. We are not persuaded.

The following additional facts and procedural history are relevant. The declarations page of the policy provides that there shall be a $500,000 limit for professional liability coverage for "[e]ach [m]edical [i]ncident." "Medical [i]ncident" is defined by the policy as "any act, error or omission in the providing of or failure to provide professional services." "Professional [s]ervices," in turn, are defined in relevant part as "[m]edical, surgical, dental, nursing or other health care services including but not limited to the furnishing of food or beverages in connection with such services . . . ." Finally, within the section of the professional liability part of the policy captioned "LIMITS OF INSURANCE," the following is provided: "All claims arising from continuous, *related,* or repeated *medical incidents* shall be treated as arising out of one medical incident. Only the [p]olicy in effect when the first such claim is made shall apply to all such claims." (Emphasis added.)

The parties do not dispute that the individual defendants' claims arise from medical incidents, namely, Lexington Healthcare's acts, errors and omissions in providing, or failing to provide, professional services, as defined by the policy. They differ, however, as to whether those medical incidents properly may be characterized as "related" such that a single, $500,000 per medical incident coverage limit applies to all of the individual defendants' claims.

The trial court, after examining the policy, first found that the term "related" was ambiguous in that it could refer to either a narrow or broad range of connections. In the context of the present dispute, "related" could contemplate, on the one hand, "different but connected services delivered to a particular [individual defendant]," or, on the other hand, "similar or related services delivered to a number of [individual defendants]." More to the point, "related" could encompass all of the acts, errors or omissions that collectively led to a particular individual defendant's injuries or death, i.e., the connected array of failures that exposed that individual to the fire, then prevented him or her from being rescued or otherwise protected from the fire's effects. Alternatively, "related" could be construed more expansively as encompassing similar acts, errors or omissions that ended up harming all of the individual defendants, in particular, the admission of, and failure to supervise, the individual who started the fire.

Because of this ambiguity, the trial court construed the policy in favor of providing broader coverage to the

insured, concluding that the allegations underlying the individual defendants' claims were not "related" and, therefore, did not constitute a single "medical incident" within the meaning of the policy limitation. Consequently, the trial court held, the $500,000 per medical incident limit applied to each individual defendant's claim separately and not to all of those claims collectively. The court reasoned further that Lexington Healthcare owed separate duties to each individual defendant, each of whom was differently situated and had different service needs, and that, during the fire and subsequent evacuation, Lexington Healthcare had failed to take appropriate action as to each individual defendant in different and distinct ways.[7]

The plaintiff argues on appeal that the trial court improperly found that the term "related" is ambiguous. According to the plaintiff, related unambiguously has a broad meaning and, as applied to this case, requires aggregation of the individual defendants' claims because all of those claims "have a causal or logical connection" to the same source, namely, "the alleged failure to supervise the patient who started the fire and the resultant fire." Nationwide and the individual defendants argue, to the contrary, that the phrase "related . . . medical incidents" is vague and ambiguous and, therefore, must be construed in favor of providing more coverage to Lexington Healthcare. Moreover, according to Nationwide and the individual defendants, the individual defendants' claims arose from different medical incidents because Lexington Healthcare owed each individual defendant a separate duty, committed different acts of negligence as to each and caused each discrete harm. We agree with Nationwide and the individual defendants that the acts, errors and omissions underlying the individual defendants' claims are not "related" within the meaning of the policy.

We address at the outset the plaintiff's argument that the trial court improperly concluded that the term related is ambiguous because several other courts have determined the term to be unambiguous, and decisions which have found the term to be ambiguous have been undermined by later decisions, from the same or different courts, which hold that related is unambiguous. We are not persuaded by this argument, because "[c]ontext is often central to the way in which policy language is applied; the same language may be found both ambiguous and unambiguous as applied to different facts." *Highwoods Properties, Inc.* v. *Executive Risk Indemnity, Inc.*, 407 F.3d 917, 923 (8th Cir. 2005). Language in an insurance contract, therefore, must be construed "in the circumstances of [a particular] case, and *cannot be found to be ambiguous [or unambiguous] in the abstract.*" (Emphasis in original; internal quotation marks omitted.) *Bay Cities Paving & Grading, Inc.* v. *Lawyers' Mutual Ins. Co.*, 5 Cal. 4th 854, 867, 855 P.2d 1263, 21 Cal. Rptr. 2d 691 (1993); see also *Doe* v. *Illinois*

*State Medical Inter-Ins. Exchange*, 234 Ill. App. 3d 129, 137, 599 N.E.2d 983 ("[i]n determining whether there is an ambiguity, the clause must be read within its factual context"), appeal denied, 147 Ill. 2d 626, 606 N.E.2d 1225 (1992). In sum, the same policy provision may "shift between clarity and ambiguity with changes in the event at hand"; (internal quotation marks omitted) *Bay Cities Paving & Grading, Inc.* v. *Lawyers' Mutual Ins. Co.*, supra, 868; and one court's determination that the term related was unambiguous, in the specific context of the case that was before it, is not dispositive of whether the term is clear in the context of a wholly different matter.

Turning to the term at issue, "related" generally is defined[8] as "connected by reason of an established or discoverable relation," with "relation" meaning "an aspect or quality . . . ." Webster's Third New International Dictionary (2002); see also Random House Dictionary (2013) (defining related as "associated; connected"); Black's Law Dictionary (6th Ed. 1990) (defining related as "standing in relation; connected; allied; akin"). Courts of other jurisdictions, considering these or similar definitions, have opined that the term related covers a broad range of connections, both causal and logical. See, e.g., *Bay Cities Paving & Grading, Inc.* v. *Lawyers' Mutual Ins. Co.*, supra, 5 Cal. 4th 868; *American Commerce Ins. Brokers, Inc.* v. *Minnesota Mutual Fire & Casualty Co.*, 551 N.W.2d 224, 228 (Minn. 1996); *Columbia Casualty Co.* v. *CP National, Inc.*, 175 S.W.3d 339, 348 (Tex. Civ. App. 2004). At the same time, however, they have recognized that discrete events have the potential to be linked in myriad ways, and at some point, a line must be drawn to prevent aggregation of events whose connections to each other are simply too weak. In such cases, "a relationship between [the] two claims, though perhaps 'logical,' might be so attenuated or unusual that an objectively reasonable insured could not have expected they would be treated as a single claim under the policy." *Bay Cities Paving & Grading, Inc.* v. *Lawyers' Mutual Ins. Co.*, supra, 873; see also *American Commerce Ins. Brokers, Inc.* v. *Minnesota Mutual Fire & Casualty Co.*, supra, 228. When "a logical connection [becomes] too tenuous reasonably to be called a relationship . . . the rule of restrictive reading of broad language [in favor of the insured] would come into play." *Gregory* v. *Home Ins. Co.*, 876 F.2d 602, 606 (7th Cir. 1989). "[A] term [specifically, related acts] should be found unambiguous if the facts of the case comfortably fit within the commonly accepted definition of the concept, but may be ambiguous if the facts fall on the margins of a broad reading." (Internal quotation marks omitted.) *Highwoods Properties, Inc.* v. *Executive Risk Indemnity, Inc.*, supra, 407 F.3d 924.

Applying the foregoing definitions and their associated limits to the specific allegations of negligence

raised by the individual defendants, we are not convinced that the various acts, errors and omissions alleged by each individual defendant are so readily associated with those alleged by the others that collectively, they fit comfortably within the realm of connection contemplated by the parties to the policy when they agreed to aggregate related medical incidents. Each individual defendant has raised multiple allegations of negligence, in some cases upwards of twenty. Although some allegations pertain to negligent supervision of the individual who started the fire, others aver a wide variety of different safety and response failures by Lexington Healthcare. Because each individual defendant was differently situated in terms of his or her proximity to the fire and resultant smoke, access to an exit, and personal health and mobility issues, the particular array of negligent shortcomings that ultimately led to his or her injury or death necessarily varied. Additionally, to the extent similar acts, errors or omissions appear across multiple complaints, they nevertheless are alleged to have caused multiple, distinct losses to different individuals. Overall, the medical incidents underlying the individual defendants' claims are as dissimilar as they are alike. In sum, it is far from clear from the policy's use of the term "related," with no more specific definition of that term provided, that the parties intended multiple losses suffered by multiple people, each caused by a unique constellation of negligent acts, errors and omissions, to be aggregated into a single loss, for purposes of coverage limits, simply because they shared a common, precipitating factor. Consequently, like the trial court, we construe the term in favor of providing more coverage, and hold that the individual defendants' claims do not arise from related medical incidents.

Although we are unable to locate any other case directly on point, our conclusion is consistent with decisions from other jurisdictions considering whether claims, acts, omissions or incidents are related for purposes of determining coverage limits in a professional liability policy. Overall, although courts have employed a variety of analytical approaches; see *Scott* v. *American National Fire Ins. Co.*, 216 F. Sup. 2d 689, 694 (N.D. Ohio 2002) (discussing various approaches); they have tended to reach fairly predictable results, in particular on the factor of loss. To begin, when there are multiple acts of negligence by an insured that all pertain to the same general undertaking and also contribute to the same loss, those acts typically are found to be related. See, e.g., *Continental Casualty Co.* v. *Brooks*, 698 So. 2d 763, 764–65 (Ala. 1997) (attorney's negligent preparation of four quitclaim deeds and power of attorney for same client were series of "related acts" because they all led to single result, loss of title to same property); *Bay Cities Paving & Grading, Inc.* v. *Lawyers' Mutual Ins. Co.*, supra, 5 Cal. 4th 866–73 (attorney's

failure to serve stop notice on construction project lenders and to file timely foreclosure action were "related acts, errors or omissions" because both failures arose from same transaction, collection of single debt, and resulted in same injury, loss of debt); *Paradigm Ins. Co.* v. *P & C Ins. Systems*, 747 So. 2d 1040, 1042–43 (Fla. App. 2000) (insurance agency's negligent failure to procure primary liability insurance for client and its subsequent failure to notify excess insurance carrier of client's claim were "related acts" because they both pertained to loss of coverage for same $2 million judgment against client); *Columbia Casualty Co.* v. *CP National, Inc.*, supra, 175 S.W.3d 348 (physicians' misinterpretation of X ray and failure to advise of need for follow-up X ray comprised "related medical incidents" when both led to same outcome, patient's death from belatedly diagnosed lymphoma).[9]

Conversely, multiple acts of negligence by an insured usually are held to be unrelated when, although connected by some aspect, they have caused distinctly different damages. In some instances, acts are held to be unrelated when they have caused different losses to the same party. See, e.g., *Federal Deposit Ins. Corp.* v. *Mmahat*, 907 F.2d 546, 553–54 (5th Cir. 1990) (attorney's repeated wrongful advice to bank to make loans in excess of regulatory maximum was not "series of related acts" because precise character of wrongful advice varied and results were discrete losses on seven different loans), cert. denied, 499 U.S. 936, 111 S. Ct. 1387, 113 L. Ed. 2d 444 (1991); *Kopelowitz* v. *Home Ins. Co.*, 977 F. Sup. 1179, 1188 (S.D. Fla. 1997) (attorney's failure to perfect client's security interest and his subsequent mishandling of bankruptcy proceedings on client's behalf were not "related acts, errors or omissions" because resulting claims involved "distinct facts and possible damages"); *Doe* v. *Illinois State Medical Inter-Ins. Exchange*, supra, 234 Ill. App. 3d 133–37 (physician's multiple, distinct errors in course of treating patient for diabetes were not "related acts or omissions" where patient developed pancreatitis, which also was improperly treated, necessitating multiple surgeries on multiple organs, during which patient contracted hepatitis and HIV from blood transfusions); *Medical Malpractice Joint Underwriting Assn. of Rhode Island* v. *Lyons*, Docket No. PC 00-5583, 2004 WL 3190049, *6–7 (R.I. Super. December 17, 2004) (physician's ongoing treatment failures in respect to patient's two separate maladies were not " 'related acts or omissions' ").[10]

In other cases, courts have concluded that acts are unrelated when they cause different losses to different parties.[11] See, e.g., *Argent Financial Group, Inc.* v. *Fidelity & Deposit Co. of Maryland*, Docket No. Civ. A. 04-2323, 2005 WL 2304515, *9 (W.D. La. August 21, 2005) (five claims made against securities broker for breach of fiduciary duty did not concern "related . . . wrongful acts" when they involved different customers,

transactions and types of wrongdoing); *Scott* v. *American National Fire Ins. Co.*, supra, 216 F. Sup. 2d 693–95 (attorney's negligence in incorporating business, assigning it property rights and performing due diligence as to value of property rights were not "related acts, errors and omissions" when he owed different duties to three claimants, corporation and two of its investors, each of whom suffered different and discrete harms); *National Union Ins. Co. of Pittsburgh, PA* v. *Holmes & Graven*, 23 F. Sup. 2d 1057, 1069–70 (D. Minn. 1998) (separate claims of housing authority and project bond trustee against attorney pertaining to his negligent preparation of documents in connection with housing project financing did not arise out of " 'related acts, errors or omissions' " because each claimant's loss differed as to both type and amount); *St. Paul Fire & Marine Ins. Co.* v. *Chong*, 787 F. Sup. 183, 188 (D. Kan. 1992) (attorney's multiple errors in representing three codefendants in criminal matter were not " 'series of related wrongful acts' " when there were several discrete omissions and actions by attorney which resulted in different losses to each codefendant); *Beale* v. *American National Lawyers Ins. Reciprocal*, 379 Md. 643, 666–67, 843 A.2d 78 (2004) (attorney's separate but similar errors in representing five children in lead paint action were not "related . . . professional services" because he owed separate duties to each child and caused distinct damages as to each child).[12]

To summarize, we conclude that the phrase related medical incidents does not clearly and unambiguously encompass incidents in which multiple losses are suffered by multiple people, when each loss has been caused by a unique set of negligent acts, errors or omissions by the insured, even though there may be a common precipitating factor. Moreover, cases from other jurisdictions construing similar policy language generally hold that when multiple losses are caused, to either the same or multiple parties, the causative acts are not related. Guided by those decisions and the rule requiring any ambiguity in an insurance policy to be construed in favor of affording greater coverage, we conclude that the acts, errors or omissions underlying the individual defendants' claims against Lexington Healthcare are not related medical incidents under the terms of the policy. Accordingly, a separate per medical incident coverage limit applies to each individual defendant's claim.

## II

The plaintiff also claims that the trial court improperly concluded that the policy provides a total of $10 million in professional liability coverage for all of the individual defendants' claims, rather than a total of only $1 million. According to the plaintiff, the trial court improperly interpreted a $10 million "[a]ggregate [p]olicy [l]imit" provided by an endorsement to the policy

as superseding the $1 million "[a]ggregate [l]imit" for professional liability coverage that is listed in the policy declarations. Nationwide and the individual defendants argue that the trial court properly interpreted the policy as affording a total of $10 million in professional liability coverage for all of the individual defendants' claims. We agree with the plaintiff that only $1 million of professional liability coverage is available for all of the individual defendants' claims.

The following additional facts are relevant. On the declarations page of the policy, under the heading of "LIMITS OF INSURANCE," the following provisions are included:

"(a) Healthcare Professional Liability

"Aggregate Limit    $1,000,000

"Each Medical Incident   $500,000 . . .

"(b) Healthcare General Liability

"Aggregate Limit    $1,000,000 . . .

"Each Occurrence Limit   $500,000 . . . ."

As we previously noted, it is undisputed that only professional liability coverage is available for the individual defendants' claims.

The policy includes separate coverage parts outlining the terms of professional liability coverage and general liability coverage, entitled, respectively, "Healthcare Professional Liability Claims Made Coverage Part for Long Term Care Facilities" and "Healthcare General Liability Claims Made Coverage Part for Long Term Care Facilities." Section IV of the professional liability part of the policy provides in relevant part:

"IV. LIMITS OF INSURANCE

"A. The Limits of Insurance shown in the Declarations for Healthcare Professional Liability for Long Term Care Facilities and the rules below fix the most we will pay regardless of the number of:

"1. Insureds;

"2. Claims made or suits brought; or

"3. Persons or organizations making claims or bringing suits.

"B. The Aggregate Limit is the most we will pay for the sum of all damages under this Coverage Part."[13]

The policy also contains a number of endorsements, including endorsement no. 3, which provides in relevant part:[14]

"II. AGGREGATE LIMITS PER LOCATION . . .

"A. HEALTHCARE PROFESSIONAL LIABILITY COVERAGE PART FOR LONG TERM CARE FACILITIES, Section IV. Limits of Insurance, Item B. is deleted in

its entirety and replaced with the following:

"The Aggregate Limit is the most *we* will pay for the sum of all damages under this Coverage Part. The Aggregate Limit shall apply separately to each *location* owned or rented by *you*." (Emphasis in original.)

Thus, part II A of endorsement no. 3 amends § IV of the professional liability part of the policy, previously recited, to add the following sentence to subsection B: "The Aggregate Limit shall apply separately to each location owned or rented by you."[15]

Endorsement no. 3 also amends the definitions section of the policy, which applies to both the general and professional liability parts, to add the following definition: "*Location* means premises involving the same operations of the Named Insured using the same or connecting lots, or premises involving the same operations of the Named Insured whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad." (Emphasis in original.)

Endorsement no. 3 provides further that "[t]he policy is amended" with the following language: "The Aggregate Policy Limit stated below is the most *we* will pay for any annual period for the sum of all damages payable under the HEALTHCARE PROFESSIONAL LIABILITY COVERAGE PART FOR LONG TERM CARE FACILITIES and the HEALTHCARE GENERAL LIABILITY COVERAGE PART FOR LONG TERM CARE FACILITIES.

"AGGREGATE POLICY LIMIT: $10,000,000." (Emphasis in original.)

At its conclusion, endorsement no. 3 provides that "[a]ll other terms, conditions and exclusions of the [p]olicy remain unchanged."

Finally, another endorsement to the policy, endorsement no. 2, which is captioned "Schedule of Locations Endorsement," provides that "[t]he Policy is amended as follows: The insurance provided by [the] . . . HEALTHCARE GENERAL LIABILITY COVERAGE PART [and the] HEALTHCARE PROFESSIONAL LIABILITY COVERAGE PART shall be limited to the following location(s), unless otherwise provided for within the Policy . . . ." Thereafter, seven Connecticut addresses are listed, one of which is the address for Greenwood.

After examining endorsement no. 3 of the policy, the trial court concluded that the total amount of professional liability coverage available for the individual defendants' claims clearly and unambiguously was $10 million and not $1 million. In reaching its conclusion, the court equated the term "[a]ggregate [l]imit" with the term "[a]ggregate [p]olicy [l]imit," thus reading § IV B of the professional liability part of the policy, as modified by endorsement no. 3, as providing $10 million

of professional liability coverage for each of the seven insured locations. The court reasoned that aggregate limit was undefined by the policy, and it attributed any difference in the two terms to the use of shorthand or a scrivener's error. Furthermore, according to the trial court, "the [$1 million] aggregate limit [for professional liability coverage] found in the declarations is irrelevant," because it had been altered by endorsement no. 3.

We agree with the trial court's assessment of the policy as clear and unambiguous, but disagree with its conclusions. The trial court's interpretation of the policy is incorrect for the following reasons. First, the court improperly equated the different terms aggregate limit and aggregate policy limit when no compelling reason existed to do so. Typically, when different terms are employed within the same writing, different meanings are intended. Cf. *Scholastic Book Clubs, Inc.* v. *Commissioner of Revenue Services*, 304 Conn. 204, 217, 38 A.3d 1183 (applying rule in statutory construction), cert. denied,    U.S.   , 133 S. Ct. 425, 184 L. Ed. 2d 255 (2012). Using the ordinary meanings of its component words,[16] the phrase "[a]ggregate [p]olicy [l]imit," which appears only in endorsement no. 3, clearly conveys that the amount specified, $10 million, is the maximum amount of insurance available under the entire policy when claims for both general liability and professional liability coverage, at all insured locations, are combined.[17] Additionally, that endorsement explicitly provides that the "[a]ggregate [p]olicy [l]imit" is the most the plaintiff will pay annually for the sum of all damages under *both* the general liability and professional liability parts of the policy.

In contrast, the term "[a]ggregate [l]imit" appears both in the declarations page, directly beneath the heading, "Healthcare Professional Liability," and in § IV B of the professional liability part of the policy, both prior to and following its amendment by endorsement no. 3. By virtue of its placement and the absence of the word "policy," the term "[a]ggregate [l]imit" logically means the total amount available for professional liability coverage only, at a particular location.[18]

Next, in reading the policy as it did, the trial court rendered the portion of the declarations page pertaining to aggregate limits superfluous, referring to it as "irrelevant," instead of attempting to read the declarations in conjunction with endorsement no. 3 to see if each part of the policy could be given effect. "A rider or endorsement is a writing added or attached to a policy or certificate of insurance which expands or restricts its benefits or excludes certain conditions from coverage. 2 L. Russ & T. Segalla, Couch on Insurance (3d Ed. 2005) § 18:17, p. 18-24. When properly incorporated into the policy, the policy and the rider or endorsement together constitute the contract of insurance, and are to be read together to determine the contract actually intended by

the parties. Id., p. 18-26." (Internal quotation marks omitted.) *National Grange Mutual Ins. Co.* v. *Santaniello*, 290 Conn. 81, 93, 961 A.2d 387 (2009). "[I]n construing an endorsement to an insurance policy, the endorsement and policy must be read together, and the policy remains in full force and effect except as altered by the words of the endorsement." (Internal quotation marks omitted.) *Liberty Mutual Ins. Co.* v. *Lone Star Industries, Inc.*, 290 Conn. 767, 806, 967 A.2d 1 (2009).

By its plain terms, the portion of endorsement no. 3 providing for an aggregate policy limit for general and professional liability coverage does not purport to alter or supersede any specific, preexisting part of the policy, but only to "amend" the policy as a whole. Consequently, it is most reasonably read as an *addition* to the policy, made necessary by the simultaneous addition of endorsement no. 2, which extends the general and professional liability coverage afforded by the policy to seven different insured locations. In contrast, a different portion of endorsement no. 3 provides clearly that § IV B of the professional liability portion of the policy is "deleted" and "replaced" with the substitute language that was then set forth.[19] That substitute language makes clear that the $1 million aggregate limit for professional liability coverage stated in the declarations remains in effect, but applies "separately to each location . . . ." Endorsement no. 3 concludes by verifying that "[a]ll other terms, conditions and exclusions of the [p]olicy remain unchanged." In short, nothing in endorsement no. 3 suggests that the aggregate limits shown in the declarations have been altered, or rendered irrelevant, other than to make clear that they apply separately to each location. Accordingly, the $1 million aggregate limit for professional liability coverage remains in effect, but applies separately to each insured location.

"To the extent that an interpretation makes another term or provision meaningless, that interpretation should be rejected in favor of an interpretation that preserves meaning." 1 J. Thomas & F. Mootz, New Appleman on Insurance Law (Library Ed. 2011) § 5.03 [1], p. 5-31. "We previously have recognized the canon of construction of insurance policies that a policy should not be interpreted so as to render any part of it superfluous. . . . [W]e have consistently stated that [i]f it is reasonably possible to do so, every provision of an insurance policy must be given operative effect . . . because parties ordinarily do not insert meaningless provisions in their agreements. . . . Since it must be assumed that each word contained in an insurance policy is intended to serve a purpose, every term will be given effect if that can be done by any reasonable construction . . . . A construction of an insurance policy which entirely neutralizes one provision should not be adopted if the contract is susceptible of another construction which gives effect to all of its provisions and is consistent with the general intent." (Internal quo-

tation marks omitted.) *R.T. Vanderbilt Co.* v. *Continental Casualty Co.*, 273 Conn. 448, 468–69, 870 A.2d 1048 (2005).

Reading all of the policy's provisions together, we can discern a construction that gives effect to all of those provisions and renders none of them superfluous. The policy, without consideration of the endorsements, provides for a total of $1 million in general liability coverage and a total of $1 million in professional liability coverage for a single location. These coverage limits are stated clearly on the declarations page under the heading of "Limits of Insurance," where an "Aggregate Limit" of $1 million is listed for each type of coverage. Section IV of each coverage part, prior to any amendment, reinforces those limits, providing that "[t]he Limits of Insurance shown in the Declarations . . . fix the most we will pay," and, for each type of coverage, that "[t]he Aggregate Limit is the most we will pay for the sum of all damages under this Coverage Part."

The policy then is amended by endorsements so as to cover additional locations owned or rented by the insured. Endorsement no. 2 lists seven different locations and provides that the policy shall apply to them. Endorsement no. 3 defines "location," in part, as contiguous premises involving the same operation, and also changes § IV of each coverage part by adding: "The Aggregate Limit shall apply separately to each location owned or rented by you." Once this language is added, the policy provides for $1 million in general liability coverage for each of the seven insured locations, and $1 million in professional liability coverage for each of the seven insured locations.

If we were to read no further, the foregoing provisions would extend a total of $14 million in coverage to Lexington Healthcare, $1 million of each type of coverage for each of the seven locations. Endorsement no. 3 provides further, however, for a $10 million "[a]ggregate [p]olicy [l]imit," defined as "the most [the plaintiff] will pay for any annual period for the sum of all damages payable under the [professional liability and general liability portions of the policy]." We agree with the plaintiff that, read in the context of the policy as a whole, the aggregate policy limit provision caps total annual coverage under the policy, for all locations and both types of coverage, at $10 million when, without that provision, the maximum coverage would have been $14 million. Properly construed, the aggregate policy limit amends the policy to reduce the total combined coverage to an amount that is less than what it otherwise would have been.

"A firm foundational rule in the construction of insurance contracts is that the expressed intent of the parties is to be ascertained by examining the contract or policy as a whole." 2 S. Plitt et al., Couch on Insurance (3d Ed. Rev. 2010) § 21:19, p. 21-76. "[T]he policy must be

construed in its entirety, with each clause interpreted in relation to others contained therein. All its words, parts, and provisions must be construed together as one entire contract, each part interpreted in the light of all the other parts in connection with the risk or subject matter." Id., pp. 21-77 through 21-82.

By equating distinct terms and reading endorsement no. 3 in isolation, rather than in conjunction with other parts of the policy, the trial court improperly rendered the aggregate limits provided by the declarations superfluous and improperly concluded that a total of $10 million in professional liability coverage was available for all of the individual defendants' claims. We conclude, to the contrary, that the policy provides for only $1 million in professional liability coverage for those claims, because that is the aggregate limit for that coverage part at a single insured location.[20]

### III

We now turn to the individual defendants' cross appeal. The individual defendants claim that the trial court improperly interpreted an endorsement to the policy providing for a self-insured retention. According to the individual defendants, the court improperly applied the terms of the endorsement to conclude that the plaintiff's liability for a particular medical incident commences only when the damages caused by that medical incident exceed $250,000. In the alternative, the individual defendants contend that the court improperly held that the plaintiff's liability is limited to $250,000 per medical incident. We disagree with the individual defendants' first claim, but agree with their second claim.

The following additional facts and procedural history are relevant. As we stated previously, the limits of insurance are provided on the declarations page of the policy. Under the subheading of "Healthcare Professional Liability," the following appears:

"Aggregate Limit     $1,000,000

"Each Medical Incident    $500,000

"Deductible     SEE ENDORSEMENT #5

"Deductible Aggregate    SEE ENDORSEMENT #5"

In § IV of the healthcare professional liability part of the policy, the following language is provided:

"A. The Limits of Insurance shown in the Declarations for Healthcare Professional Liability for Long Term Care Facilities . . . fix *the most we will pay* regardless of the number of:

"1. Insureds;

"2. Claims made or suits brought; or

"3. Persons or organizations making claims or bringing suits. . . ." (Emphasis added.)

Endorsement no. 5 of the policy is captioned "SELF INSURED RETENTION ENDORSEMENT (Expenses within the Self Insured Retention)" and provides in relevant part[21] as follows:

"It is agreed that . . . Section V, DEDUCTIBLE, in the HEALTHCARE PROFESSIONAL LIABILITY COVERAGE PART FOR LONG TERM CARE FACILITIES [is] . . . deleted in [its] entirety and . . . replaced with the following:

"A. The First Named Insured [defined elsewhere in the policy as Lexington Healthcare] shall be responsible for the Self Insured Retention amounts shown below. Expenses incurred by the First Named Insured in investigating and defending claims and suits are included within the Self Insured Retentions. The Self Insured Retention applies separately to each medical incident . . . to which this policy applies, and the First Named Insured shall not insure against it without our written consent. . . .

"2. All claims arising from a single medical incident or continuous, related or repeated medical incidents shall be subject to one Self Insured Retention. The Self Insured Retention Medical Incident Aggregate stated below is the total amount of damages arising out of all Self Insured Retentions for all medical incidents during the policy period.

"B. We will pay damages only in excess of the Self Insured Retentions stated below. We will not be responsible for payment of amounts within the Self Insured Retentions, which the First Named Insured will be obligated to pay.

"C. Our rights and duties with respect to the defense and settlement of claims applies only when [a] . . . medical incident is excess of the Self Insured Retention stated below and only for that portion of the loss which is excess of the Self Insured Retention.

"D. The Limits of Liability as stated in this policy will be reduced by the payment of damages and expenses paid within the Self Insured Retentions.

"E. The First Named Insured shall at all times maintain a claims handling service approved by us to handle claims within the Self Insured Retentions.

"F. The First Named Insured shall immediately notify us in writing of any claims to which this policy applies which

"1. an Insured has received notice of a suit in which the damage demand exceeds the amount of the Self Insured Retention, or

"2. may exceed 50% of the Self Insured Retention . . . .

"Schedule of Self Insured Retentions . . . .

"Self Insured Retention per Medical Incident: $250,000

"Self Insured Retention Medical Incident Aggregate: Not Applicable

"All other terms, conditions and exclusions of the policy remain unchanged."

The trial court interpreted endorsement no. 5 as requiring the plaintiff to provide coverage to Lexington Healthcare for each medical incident only to the extent that damages for that incident exceeded $250,000, the amount of the self-insured retention. According to the court, even though Lexington Healthcare is insolvent; see footnote 4 of this opinion; and, therefore, unable to pay the self-insured retention amount itself, the policy clearly provides that the plaintiff is not responsible for the first $250,000 of damages for each medical incident. The trial court concluded further that endorsement no. 5 operates to reduce the maximum amount payable by the plaintiff for any one medical incident from $500,000, as stated in the declarations, to $250,000.[22]

The individual defendants claim that both of the trial court's conclusions regarding endorsement no. 5 are improper. They argue that, because Lexington Healthcare has not paid the $250,000 self-insured retention for each medical incident due to its insolvency, the insurance provided by the plaintiff should "drop down," thereby triggering coverage beginning with the first dollar of each individual defendant's claim, rather than after the $250,000 threshold has been reached. The individual defendants claim alternatively that, even if the trial court correctly held that coverage begins only once a particular claim exceeds $250,000, it improperly held that the maximum amount available for each claim is $250,000, rather than the $500,000 per medical incident provided for in the policy declarations. We disagree with the individual defendants' first contention, but agree with the second one.

To begin, paragraphs A and B of endorsement no. 5 make it abundantly clear that Lexington Healthcare, and not the plaintiff, must pay the first $250,000 of damages attributable to any one medical incident, including investigation and defense expenses. Specifically, paragraph A provides that Lexington Healthcare "shall be responsible for the Self Insured Retention [amount] shown below," specified as $250,000 per medical incident, and paragraph B provides that the plaintiff "will pay damages only in excess of the Self Insured Retentions stated below . . . [and] will not be responsible for payment of amounts within the Self Insured Retentions, which [Lexington Healthcare] will be obligated to pay." The plaintiff's lack of responsibility for damages within the self-insured retention is reinforced further by paragraph C of endorsement no. 5, which provides that its duty to defend and settle claims applies

only when a "medical incident is excess of the Self Insured Retention stated below and only for that portion of the loss which is excess of the Self Insured Retention," and paragraph F of the endorsement, which indicates that Lexington Healthcare need not even notify the plaintiff of a claim unless it is possible that it will exceed the amount of the self-insured retention. Because all of the foregoing obligations are stated in clear, unqualified language, we decline to impute an exception to which the parties did not explicitly or impliedly agree, namely, that the plaintiff's coverage would "drop down" within the self-insured retention in the event Lexington Healthcare could not fulfill its obligations under paragraphs A and B of endorsement no. 5.[23] Consequently, we conclude that the trial court correctly held that the plaintiff is not liable for the first $250,000 of each individual defendant's claim.

Although we agree with the trial court that the plaintiff's coverage does not "drop down" due to the unsatisfied self-insured retention, we disagree with the court's conclusion that, once the plaintiff's duty to indemnify is triggered by the amount of a particular claim exceeding $250,000, its liability for that claim is limited to only the next $250,000 of damages, and not the $500,000 per medical incident provided in the declarations, which, pursuant to § IV A of the policy, is "the most [the plaintiff] will pay . . . ."[24] Although it did not specifically so state; see footnote 22 of this opinion; the court presumably made this determination in reliance on paragraph D of endorsement no. 5, which provides that "[t]he Limits of Liability as stated in this policy will be reduced by the payment of damages and expenses paid within the Self Insured Retention." The plaintiff argues that this provision unambiguously reduces the $500,000 per medical incident limit stated in the policy endorsements by $250,000, the amount of each claim that is within the self-insured retention. The individual defendants contend that the provision is unclear and, therefore, should be construed in favor of affording more coverage. We agree with the individual defendants.

Specifically, paragraph D of endorsement no. 5 does not provide, as it easily could have, that the plaintiff's limits of liability are reduced "to $250,000 per medical incident," "by the amount of claims made within the Self Insured Retention" or by "the amount of the Self Insured Retention." Rather, that paragraph provides that those limits will be reduced "by the *payment* of damages and *expenses paid* within the Self Insured Retentions." (Emphasis added.) Reading the endorsement literally, the triggering factor for a reduction in liability limits is the insured's actual fulfillment of its obligation to pay the self-insured retention. Additionally, the paragraph gives no indication as to what should occur in the event the insured cannot fulfill that obligation due to its insolvency. Because paragraph D is, at the very least, ambiguous, it must be construed in favor

of the insured, so as not to reduce the coverage limits clearly provided in the policy declarations.[25] See *Johnson* v. *Connecticut Ins. Guaranty Assn.*, supra, 302 Conn. 643. Accordingly, we conclude that the trial court improperly held that, pursuant to endorsement no. 5, the limit of the plaintiff's liability for each medical incident is reduced to $250,000.

In sum, the trial court properly construed endorsement no. 5 to conclude that the plaintiff's liability for each medical incident begins only after damages for that incident exceed $250,000. The court improperly concluded, however, that the plaintiff's liability thereafter is limited to $250,000 per medical incident, rather than the $500,000 provided in the policy declarations. Instead, because the $500,000 per medical incident limitation provided in the declarations has not clearly been altered by endorsement no. 5 in the circumstances of this case, the plaintiff remains potentially liable for the next $500,000 in damages for each medical incident.

The judgment with respect to the April 13, 2009 decision is reversed in part in SC 18681 and the case is remanded with direction to render partial summary judgment in favor of the individual defendants and Nationwide in accordance with this opinion; the plaintiff's cross appeal in SC 18682 is dismissed.

In this opinion NORCOTT, PALMER and ZARELLA, Js., concurred.

* This case originally was decided on June 18, 2013, by a five member panel of this court consisting of Chief Justice Rogers and Justices Norcott, Palmer, Zarella and Eveleigh. See *Lexington Ins. Co.* v. *Lexington Healthcare Group, Inc.*, 309 Conn. 1, 68 A.3d 1121 (2013). We subsequently granted the motion for reconsideration en banc filed by the defendant Nestor Rodriguez, conservator of the person of Jose Rodriguez, et al. Accordingly, Justices McDonald and Espinosa were added to the panel, and they have read the record and briefs and listened to a recording of oral argument prior to participating in this decision. On reconsideration en banc, Justice Norcott has reconsidered his original vote and joins Justices Palmer and Zarella in concurring with the Chief Justice's majority opinion, and Justices McDonald and Espinosa join in Justice Eveleigh's concurring and dissenting opinion. Because of these changes in the panel and vote, this opinion supersedes our prior decision in all respects. See *Honulik* v. *Greenwich*, 293 Conn. 698, 702 n.1, 980 A.2d 880 (2009).

[1] Nationwide is a real estate investment trust.

[2] Despite the similarities in their names, Lexington Healthcare and Highgreen have no corporate affiliation with the plaintiff.

[3] The individual defendants are: Galina Kholod, administratrix of the estate of Sofiya Ruditser; Stephen P. Andrusko, administrator of the estate of Shirley Bergeron; Marion J. Boynton and Gladys M. Dodd, coadministratrices of the estate of Elizabeth M. Arata; Ricardo Pereira, administrator of the estate of Hermenegildo Pereira; Rosa Maria Elias, administratrix of the estate of Amalia Elias; Evelyn Castro, administratrix of the estate of Gerarda Muriel; Dale Timmons, administrator of the estate of Samuel Barnes; Emily Piehl, administratrix of the estate of Elizabeth K. Nadeau; William Morin, administrator of the estate of Lois May Morin; Carmen Munoz, administratrix of the estate of Flor Munoz; Nestor Rodriguez, conservator of the person of Jose Rodriguez; Gladys Lopez, conservator of the person of Gladys Perez; William Rodriguez, administrator of the estate of Juan Rodriguez; and Juan Santiago, administrator of the estate of Justo Santiago.

[4] Prior to the filing of this action, both Lexington Healthcare and Highgreen filed for bankruptcy. The Bankruptcy Court lifted the automatic bankruptcy stay to permit the plaintiff to file the declaratory judgment action. Lexington Healthcare and Highgreen subsequently were defaulted for their failure to appear and are not participants in this appeal.

The plaintiff also named as defendants Alfred T. Giuliano, the bankruptcy trustee, Spectrum Healthcare, LLC, and Brookview Corporation. The action against Spectrum Healthcare, LLC, and Brookview Corporation subsequently was withdrawn.

[5] The defendants who cross appealed are Marion J. Boynton, Gladys M. Dodd, Ricardo Pereira and Rosa Maria Elias in their administrative capacities. See footnote 3 of this opinion.

[6] The appeals and the cross appeals in this case originally were brought to the Appellate Court, and we transferred them to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The trial court decided the issues presently on appeal in a memorandum of decision dated April 13, 2009. That decision disposed of all claims and counterclaims relating to Lexington Healthcare, Highgreen and the individual defendants, thereby rendering the trial court's judgment final as to those parties. See Practice Book § 61-3. The plaintiff's appeal, Docket No. SC 18681, and the individual defendants' cross appeal followed.

In the underlying negligence actions brought by the individual defendants, Nationwide had filed cross claims against Lexington Healthcare and Highgreen claiming both common-law and contractual indemnity and breach of contract for Lexington Healthcare's alleged failure to procure proper liability insurance pursuant to its lease with Nationwide. In the present declaratory judgment action, a subset of the plaintiff's complaint and Nationwide's counterclaims were directed at the question of insurance coverage for the indemnity and breach of contract claims.

In a second memorandum of decision dated January 26, 2010, the trial court disposed, for the most part, of these remaining claims and counterclaims involving potential coverage for Nationwide. The court concluded that no coverage was available for Nationwide's breach of contract or contractual indemnity cross claims, but that coverage potentially was available for Nationwide's common-law indemnity cross claim. It further concluded, however, that there existed a genuine issue of material fact as to whether Nationwide's claim for coverage for its common-law indemnity cross claim was timely filed. Nationwide thereafter filed an appeal, Docket No. SC 18682, from the trial court's April 13, 2009 and January 26, 2010 decisions, and the plaintiff filed a cross appeal. Nationwide subsequently withdrew its appeal. The plaintiff, however, did not withdraw its cross appeal. On December 13, 2010, this court granted the plaintiff's motion to consolidate the appeal and cross appeal in Docket No. SC 18681 with the cross appeal in Docket No. SC 18682. Prior to oral argument, we directed the parties to be prepared to address the question of whether jurisdiction exists for the cross appeal in Docket No. SC 18682 due to the lack of a final judgment. Notably, that cross appeal does not raise any new issues beyond those raised by the plaintiff in its direct appeal in Docket No. SC 18681. According to the plaintiff, it has maintained the cross appeal solely so that our decision in Docket No. SC 18681 will be binding on Nationwide as well as on the individual defendants.

In an unopposed supplemental filing, the plaintiff argues that, because the trial court already has determined the total amount of coverage for which it is liable under the policy, further proceedings cannot affect it, and the issue of whether it must indemnify Nationwide for its common-law indemnity claim is, from the plaintiff's perspective, moot. See *State* v. *Curcio*, 191 Conn. 27, 31, 463 A.2d 566 (1983) (otherwise interlocutory order is final for purposes of appeal where it "so concludes the rights of the parties that further proceedings cannot affect them"). It may be true that further proceedings may not affect *the plaintiff* in any meaningful way, but this is not the case for Nationwide. Although the total amount of coverage was determined in the trial court's April 13, 2009 judgment, the question of whether Nationwide may share in that coverage, to any extent, remains open. Accordingly, the judgment, as to Nationwide, is not final, and, therefore, the plaintiff's cross appeal in Docket No. SC 18682 must be dismissed for lack of subject matter jurisdiction. Nevertheless, this court's interpretation of the policy at issue will be binding, under general precedential principles, in any further trial court proceedings concerning the present coverage dispute. See *Kelly* v. *New Haven*, 275 Conn. 580, 600 n.21, 881 A.2d 978 (2005) (although final judgment existed in only one of three related cases on appeal, this court's interpretation of city charter necessarily bound trial courts in other two cases raising same issue).

[7] The trial court rejected the plaintiff's argument that the "event test," used by some courts to identify what is an "occurrence" for purposes of a general liability policy, similarly should apply to determine, in the context of a professional liability policy, whether "medical incidents" are related. The court reasoned that the different types of policies served different purposes such that the test from one was not transferrable to the other. We agree that decisions construing the term "occurrence" as used in general

liability insurance policies; see, e.g., *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 255 Conn. 295, 765 A.2d 891 (2001); are of limited applicability to the present matter, primarily due to differing policy language. Accordingly, we do not rely upon such cases herein.

[8] "To ascertain the commonly approved usage of a word [in an insurance policy], it is appropriate to look to the dictionary definition of the term." (Internal quotation marks omitted.) *Buell Industries, Inc.* v. *Greater New York Mutual Ins. Co.*, 259 Conn. 527, 539, 791 A.2d 489 (2002); see also 2 S. Plitt et al., Couch on Insurance (3d Ed. Rev. 2010) § 22:38, p. 22-164 ("[t]he rule that words in insurance policies are to be construed using their ordinary and popular meanings has long been recognized, and has been applied in the context of various types of insurance").

[9] But see *Arizona Property & Casualty Ins. Guaranty Fund* v. *Helme*, 153 Ariz. 129, 133–36, 735 P.2d 451 (1987) (physicians' separate failure to examine patient's X rays or react to his worsening condition not "series of related omissions," although both led to same result, patient's paralysis and death).

[10] But see *North American Specialty Ins. Co.* v. *Royal Surplus Lines Ins. Co.*, 541 F.3d 552, 558, 560 (5th Cir. 2008) (nursing home's sustained poor treatment of resident, causing him multiple injuries and indignities, amounted to "related medical incidents" when claimant's theory of case was continuing pattern and practice of neglect, not series of discrete wrongs); *URS Corp.* v. *Travelers Indemnity Co.*, 501 F. Sup. 2d 968, 977 (E.D. Mich. 2007) (engineers' various failures relating to design of two different schools for same school system, causing damages to each school, held to be "series of related acts" when schools were to be designed "in a practically identical fashion").

[11] We agree with the plaintiff that *Harris Methodist Health System* v. *Employers Reinsurance Corp.*, Docket No. 3:96-CV-0054-R, 1997 WL 446459 (N.D. Tex. July 25, 1997), on which the trial court relied in holding that the present case did not involve related medical incidents, is inapposite because the policy language at issue in *Harris Methodist Health System* differed from the policy language at issue here. Specifically, the relevant provision in *Harris Methodist Health System* provided: "Any . . . act or omission together with all related acts or omissions in the furnishing of services *to any one person* shall be considered one *medical incident*." (Emphasis added; internal quotation marks omitted.) Id., *7. Accordingly, it was clear in that case that a hospital employee's actions that injured several different patients did not together comprise a single medical incident. See id., *21–22. Nevertheless, there is ample authority, cited hereinafter, that even in the absence of explicit policy language limiting related incidents to those involving the same patient, separate negligent acts of an insured that result in discrete losses to different parties are not "related" as contemplated by a coverage limitation clause.

[12] In limited instances, courts have held acts, omissions or incidents to be related even when they have caused multiple harms to multiple parties. These cases, however, differ from the norm. In one case, the policy at issue defined the relevant provision in a fashion that created a very broad scope. See *Gateway Group Advantage, Inc.* v. *McCarthy*, 300 F. Sup. 2d 236, 240, 243–44 (D. Mass. 2003) (The court held that the franchisor had engaged in " 'related wrongful acts' " vis-á-vis different franchisees, causing each franchisee to sustain losses, when the policy provided that " 'Related Wrongful Acts' " were "Wrongful Acts which are the same, related or continuous, *or Wrongful Acts which arise from a common nucleus of facts. Claims can allege Related Wrongful Acts regardless of whether such Claims involve the same or different claimants, Insureds or legal causes of action.*" [Emphasis added.]). In three other cases, courts aggregated claims underlying class actions with cross claims by the class action defendant against its counsel for providing negligent advice or services in connection with the activities giving rise to the class members' claims. See generally *Continental Casualty Co.* v. *Wendt*, 205 F.3d 1258 (11th Cir. 2000); *Gregory* v. *Home Ins. Co.*, supra, 876 F.2d 602; *Westport Ins. Corp.* v. *Coffman*, Docket No. C2-05-1152, 2009 WL 243096 (S.D. Ohio January 29, 2009). We conclude that these decisions are readily distinguishable from the typical multiple loss cases cited herein because the class members' claims against the clients and the clients' malpractice claims against their attorneys clearly are inextricably intertwined, with the losses caused to the attorneys by their clients' malpractice claims being, in essence, derivative of the losses caused to the clients from the class members' claims. Accordingly, in those cases, the acts at issue fit comfortably and unambiguously within the commonly accepted

definition of the term related.

[13] Section IV of the general liability part of the policy reads similarly to § IV of the professional liability part of the policy, but limits the coverage afforded by the general liability provisions:

"IV. LIMITS OF INSURANCE

"A. The Limits of Insurance shown in the Declarations for Healthcare General Liability for Long Term Care Facilities and the rules below fix the most we will pay regardless of the number of:

"1. Insureds;

"2. Claims submitted or suits brought; or

"3. Persons or organizations making claims or bringing suits.

"B. The Aggregate Limit is the most we will pay for the sum of:

"1. Damages under Insuring Agreement A. Bodily Injury and Property Damage, except damages because of bodily injury or property damage included in the products-completed operations hazard;

"2. Damages under Insuring Agreement B. Personal and Advertising Injury; and

"3. Medical expenses under Insuring Agreement C."

Agreements A through C are subparts of the general liability part of the policy.

[14] The complete substantive language of endorsement no. 3 provides as follows:

"AGGREGATE LIMITS ENDORSEMENT [GENERAL LIABILITY/PRO-FESSIONAL LIABILITY]

"The Policy is amended as follows:

"I. AGGREGATE POLICY LIMIT

"The Aggregate Policy Limit stated below is the most *we* will pay for any annual period for the sum of all damages payable under the HEALTHCARE PROFESSIONAL LIABILITY COVERAGE PART FOR LONG TERM CARE FACILITIES and the HEALTHCARE GENERAL LIABILITY COVERAGE PART FOR LONG TERM CARE FACILITIES.

"AGGREGATE POLICY LIMIT: $10,000,000

"II. AGGREGATE LIMITS PER LOCATION

"Subject to the Aggregate Policy Limit stated in Item I. above:

"A. HEALTHCARE PROFESSIONAL LIABILITY COVERAGE PART FOR LONG TERM CARE FACILITIES, Section IV. Limits of Insurance, Item B. is deleted in its entirety and replaced with the following:

"The Aggregate Limit is the most *we* will pay for the sum of all damages under this Coverage Part. The Aggregate Limit shall apply separately to each *location* owned or rented by *you*.

"B. HEALTHCARE GENERAL LIABILITY COVERAGE PART FOR LONG TERM CARE FACILITIES, Section IV. Limits of Insurance, Item B. is deleted in its entirety and replaced with the following:

"The Aggregate Limit is the most we will pay for the sum of:

"1. Damages under Insuring Agreement A. Bodily Injury and Property Damage, except damages because of bodily injury or property damage included in the products-completed operations hazard;

"2. Damages under Insuring Agreement B. Personal and Advertising Injury; and

"3. Medical expenses under Insuring Agreement C.

"The Aggregate Limit shall apply separately to each location owned or rented by you.

"III. DEFINITIONS

"GENERAL POLICY PROVISIONS AND CONDITIONS, Section 1. Definitions Applicable to All Coverage Parts is amended to include the following additional definition:

"*Location* means premises involving the same operations of the Named Insured using the same or connecting lots, or premises involving the same operations of the Named Insured whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

"All other terms, conditions and exclusions of the Policy remain unchanged." (Emphasis in original.)

[15] In similar fashion, part II B of endorsement no. 3 adds the same language to § IV B of the general liability part of the policy, which concerns the limits of insurance for general liability coverage. See footnotes 13 and 14 of this opinion.

[16] See footnote 8 of this opinion.

[17] See Random House Dictionary (2012) (defining "aggregate" as "formed by the conjunction or collection of particulars into a whole mass or sum; total; combined"); id. (defining "limit" as "the final, utmost or furthest boundary or point as to extent, amount, continuance, procedure, etc.").

[18] The term "[a]ggregate [l]imit" also appears under the heading "Healthcare General Liability" on the declarations page and in § IV B of the general liability part of the policy; see footnotes 13 and 14 of this opinion; thus reinforcing the point that the term refers to the total amount available for

a particular coverage type at a particular location, and not from the policy as a whole.

[19] Similarly, another portion of endorsement no. 3 provides clearly that § IV B of the general liability portion of the policy is "deleted" and "replaced" with analogous language that was then set forth. See footnote 14 of this opinion.

[20] For the reasons we have explained, we believe that the policy language unambiguously provides for this result. Even if we were to find the policy ambiguous and, therefore, to examine the uncontested extrinsic evidence submitted to the trial court; see *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 255 Conn. 295, 306, 765 A.2d 891 (2001); we would reach the same conclusion. That evidence consists of application materials from the seven insured locations that are listed in endorsement no. 2, binders for the policy at issue and one with greater coverage limits for which Lexington Healthcare initially had applied, and a series of e-mails between agents indicating that Lexington Healthcare could not afford the initially sought coverage and needed a new quote for the same policy with lower levels of coverage. Each binder provided to Lexington Healthcare lists, on the same page, a "Policy Aggregate [Professional Liability/General Liability]" of $10 million directly below separately enumerated "[a]ggregate [l]imit[s]" for professional and general liability coverage (each set at $3 million for the policy first sought, and $1 million for the policy ultimately issued). In light of the previously issued binders, which clearly distinguished between the coverage limits for each type of insurance and that for the policy overall, Lexington Healthcare could not reasonably have confused and equated the distinct terms "[a]ggregate [l]imit" and "[a]ggregate [p]olicy [l]imit" as did the trial court. Additionally, because Lexington Healthcare, in response to the first binder listing the "Policy Aggregate [Professional Liability/General Liability]" as $10 million, sought *lesser* coverage due to an inability to pay the quoted premium, an interpretation that would provide for $140 million in total coverage for the revised policy, which commanded a lower premium, is similarly unreasonable.

[21] For clarity, as in part II of this opinion, we have deleted parallel language of the endorsement pertaining to the general liability part of the policy.

[22] The trial court explained: "The maximum policy coverage for each medical incident is $500,000. Depending on the outcome of the [individual defendants'] claims, [the plaintiff] would only be obligated to make a payment in excess of the self-insured retention of $250,000 *up to the policy limit of $500,000 for each medical incident* subject to the aggregate limit of $10 million. *In other words*, [*the plaintiff*] *would be obligated to pay each claimant any damages over $250,000 up to $500,000* (*or a maximum of $250,000* multiplied by up to thirteen medical incidents for the [individual defendants] for a total of $3,250,000)." (Emphasis added.) As we previously have concluded, the trial court improperly held that the policy's aggregate limit was $10 million, and not $1 million. Accordingly, even if trial court's subsidiary calculations were correct, the maximum amount payable under the policy would be capped at $1 million.

[23] The lack of an intent that coverage "drop down" in the event of Lexington Healthcare's bankruptcy is entirely consistent with the nature of the endorsement as a self-insured retention rather than a deductible. "A 'self-insured retention' . . . is an insurance arrangement whereby the insured takes all responsibility for dealing with claims up to a certain amount of loss. This includes adjusting the claim, either itself as the insurer or through a third-party claims administrator, defending itself against the claim, and, if necessary, paying it. Thus, as the term would suggest, the insured effectively self-insures up to the limit of the risk it has chosen to retain." 3 J. Thomas & F. Mootz, supra, § 16.09 [3] [b], p. 16-209.

"A self-insured retention differs from a deductible in several important respects. Where the insured has purchased coverage subject to [a self-insured retention], the insurer's full policy limits will be available to respond to a loss after the [self-insured retention] has been satisfied. . . . By contrast, the amount of a deductible is subtracted from the policy limits, thereby reducing the amount of available insurance. . . .

"The distinction is apparent when the policyholder is unable to pay the deductible due to insolvency. In such a case, the insurer is liable to pay covered losses up to its full policy limit and must seek reimbursement of the deductible amount from the insolvent insured." (Citations omitted.) 2 B. Ostrager & T. Newman, Handbook on Insurance Coverage Disputes (15th Ed. 2011) § 13.13 [a], p. 1177; see also 3 J. Thomas & F. Mootz, supra, § 16.09 [3] [b], p. 16-210 ("insurer in a deductible arrangement is primarily

responsible for the loss starting from its first dollar, though entitled to reimbursement from the insured, so that in case of insured insolvency . . . the insurer must pay amounts covered under the policy within the deductible for which the insured is held liable").

With a self-insured retention, however, "*the insured is liable to pay the amount of its retained limit directly to the claimant. The insurer is not obligated to pay the amount that the insolvent policyholder retained, so the insurer is not required to 'drop down' and assume the insolvent insured's liability*." (Emphasis added.) 2 B. Ostrager & T. Newman, supra, § 13.13 [a], p. 1177; see, e.g., *In re Keck, Mahin & Cate*, 241 B.R. 583, 596 (Bankr. N.D. Ill. 1999) (insurer not liable for any portion of bankrupt insured's self-insured retention); *Home Ins. Co. of Illinois* v. *Hooper*, 294 Ill. App. 3d 626, 633, 691 N.E.2d 65 (same), appeal denied, 178 Ill. 2d 576, 699 N.E.2d 1031 (1998).

[24] We recognize that this question likely has been rendered academic, in light of our holding in part II of this opinion that the aggregate limit for professional liability coverage for Lexington Healthcare at the Greenwood facility is only $1 million, and there are thirteen separate claimants. Nevertheless, out of an abundance of caution, we will address the individual defendants' claim.

[25] As we previously have explained; see footnote 23 of this opinion; a major distinction between a deductible and a self-insured retention is that, in the case of the latter, "the insurer's full policy limits will be available to respond to a loss after the [self-insured retention] has been satisfied," whereas, with the former, the deductible's amount "is subtracted from the policy limits, thereby reducing the amount of available insurance." 2 B. Ostrager & T. Newman, Handbook on Insurance Coverage Disputes (15th Ed. 2011) § 13.13 [a], p. 1177. In the policy at issue, it appears that the plaintiff drafted an endorsement that purported to be, and possessed all of the attributes of, a self-insured retention, but it also attempted to retain for itself the advantageous reduction in liability limits associated with a deductible. We agree with the individual defendants that such a hybrid approach is readily susceptible to confusion, and that the plaintiff, if it wanted to employ it, was obligated to delineate its parameters with precision. Paragraph D of endorsement no. 5 falls well short in this regard.